UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

In re:

        CELL-NIQUE CORPORATION,

                               Debtor.

------------------------------------------------------------

**HEARING DATE:** **10/16/2025**
**HEARING TIME:** **10:30 a.m.**
**HEARING PLACE:** **Albany**

Case No. 24-10508-1-rel
Chapter 11

## SECURED CREDITOR'S OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

New York Business Development Corporation d/b/a Pursuit ("Creditor"), a secured creditor in the above-captioned bankruptcy case, by and through its attorneys, Burgess & Associates P.C. (Peter L. Burgess, Esq.), hereby files this Objection to Confirmation of the Debtor's Chapter 11 Plan of Reorganization (the "Plan"), pursuant to 11 U.S.C. §§ 1129(a)(1), (a)(2), and (a)(7), and §§ 1129(b)(1) and 1129(b)(2)(A)(i)(II), and respectfully represents as follows:

### PARTIES

1.    New York Business Development Corporation d/b/a Pursuit, ("NYBDC") is a secured creditor of Cell-Nique Corporation and maintains its primary office and principal place of business at 19 British American Boulevard East, Latham, New York 12110.

2.    Cell-Nique Corporation (the "Debtor") filed its petition for relief under Chapter 11 of the United States Bankruptcy Code on May 9, 2024 in the United States Bankruptcy Court, Northern District of New York.

### BACKGROUND

3.    The Debtor is a tenant of 22 Hamilton Way, Castleton, New York (the "Mortgaged Premises") on terms set forth in the COMMERCIAL LEASE CONTRACT – TRIPLE NET dated June 15, 2016 (the "Lease").  The Mortgaged Premises is owned by PCC Castleton Corporation, a New York Corporation ("PCC Castleton").  The Debtor

and PCC Castleton are related entities, with common ownership and common management (*i.e.*, Daniel Ratner). The Debtor is a guarantor and borrower of respective loans subject of a pending state court foreclosure action against the Mortgaged Premises. The Lease requires the Debtor to pay base rent in the amount of $35,000.00 per month which was used to service the NYBDC debt.

### NYBDC Loan-1

4.      As security for payment of certain indebtedness, a MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS dated June 14, 2016 ("Mortgage-1") was executed, acknowledged and delivered to Hamilton Industrial Corporation by PCC Castleton wherein and whereby it bargained and granted to Hamilton Industrial Corporation, its successors and assigns, a lien upon the Mortgaged Premises under certain conditions with rights, duties and privileges between or among them as appears more fully in Mortgage-1.

5.      Mortgage-1 was duly recorded in the office of the County Clerk of the County of Rensselaer on the 17th day of June, 2016 in Volume 7848 of Mortgages at Page 163 and as Instrument Number: 2016-00496260.

6.      Mortgage-1 was assigned by Hamilton Industrial Corporation to NYBDC pursuant to ASSIGNMENT OF MORTGAGE dated August 10, 2016 and recorded in the office of the County Clerk of the County of Rensselaer on the 16th day of December, 2016 in Volume 8038 of Mortgages at Page 162 and as Instrument Number: 2016-00506623.

7.      PCC Castleton, for the purpose of securing and evidencing a promise to pay to NYBDC, or its assignee, a sum of money, duly executed and acknowledged a LOAN & SECURITY AGREEMENT dated December 14, 2016 ("Loan Agreement-1") and an AMENDED AND RESTATED MORTGAGE NOTE dated December 14, 2016 ("Note-1") wherein and whereby it promised for itself, its successors and assigns to pay

the amount of Five Hundred Thousand and 00/100 Dollars ($500,000.00) ("NYBDC Loan-1") according to the terms of repayment of Loan Agreement-1 and Note-1 all as appears in Loan Agreement-1 and Note-1.

8.    The Debtor (and others) guaranteed the indebtedness evidenced by Note-1 pursuant to the terms of a COMMERCIAL GUARANTY dated December 14, 2016 (the "Guaranty").

9.    The amount secured by Mortgage-1 was reduced to secure the principal sum of Five Hundred Thousand and 00/100 Dollars ($500,000.00) through MORTGAGE REDUCTION CERTIFICATE dated December 14, 2016 and duly recorded in the office of the County Clerk of the County of Rensselaer on the 16th day of December, 2016 in Volume 8038 of Mortgages at Page 164 and as Instrument No.: 2016-00506624.

10.    Mortgage-1, Loan Agreement-1, Note-1, and the Guaranty shall hereinafter collectively be referred to as the "Loan-1 Documents".

11.    PCC Castleton and the Debtor failed and neglected to comply with the terms and conditions of the Loan-1 Documents by omitting and failing to pay installments for principal and interest when due.  Due to the long-standing payment default of other indebtedness, NYBDC commenced a foreclosure action against the Mortgaged Premises on April 22, 2022.

12.    On July 24, 2024, NYBDC timely filed a Proof of Claim [Claim No. 10] asserting a secured claim in the amount of $457,593.60.  A copy of the Proof of Claim for NYBDC Loan-1 is attached hereto and made a part hereof as Exhibit "1".

13.    Debtor's Plan, filed on July 3, 2025 (EFCA No. 87), fails to list, treat, or acknowledge NYBDC's secured Claim No. 10 in any respect.

### NYBDC Loan-2

14.    As security for payment of certain indebtedness, a MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS dated

November 14, 2017 ("Mortgage-2") was executed, acknowledged and delivered to
NYBDC by PCC Castleton wherein and whereby it bargained and granted to NYBDC, its
successors and assigns, a lien upon the Mortgaged Premises under certain conditions
with rights, duties and privileges between or among them as appears more fully in
Mortgage-2.

15.     Mortgage-2 was duly recorded in the office of the County Clerk of the
County of Rensselaer on the 13th day of December, 2017 in Book 8383 of Mortgages at
Page 197 and as Instrument Number: 2017-526332.

16.     PCC Castleton, Cell-Nique Corporation, a New York Corporation, and
Cell-Nique, a Delaware Corporation, for the purpose of securing and evidencing a
promise to pay to New York Business Development Corporation, or its assignee, a sum
of money, duly executed and acknowledged a LOAN & SECURITY AGREEMENT dated
November 8, 2018 ("Loan Agreement-2") and an AMENDED AND RESTATED
MORTGAGE NOTE restated as of November 8, 2018 ("Note-2") wherein and whereby
they promised for themselves, and their successors and assigns to pay the amount of
One Million Four Hundred Fifty Seven Thousand Five Hundred and 00/100 Dollars
(1,457,500.00) ("NYBDC Loan-2) according to the terms of repayment of Loan
Agreement-2 and Note-2 all as appears in Loan Agreement-2 and Note-2.

17.     Mortgage-2, Loan Agreement-2, and Note-2 shall hereinafter collectively
be referred to as the "Loan-2 Documents".

18.     On July 24, 2024, NYBDC timely filed a Proof of Claim [Claim No. 11]
asserting a secured claim in the amount of $1,952,658.05.  A copy of the Proof of Claim
for NYBDC Loan-2 is attached hereto and made a part hereof as Exhibit "2".

19.     Debtor's Plan, filed on July 3, 2025 (EFCA No. 87), treats NYBDC's
secured Claim No. 11 as an impaired claim (Class 1) with monthly payments of
$17,500.00 and a balloon payment at the end of the 60th month.  Under the Plan, interest

on Claim 11 is reduced from the variable rate of 8.85% to the fixed rate of 6.03%.

20.    NYBDC objects to the proposed cramdown interest rate as being unreasonably low and failing to provide the present value of its secured Claim No. 11, as required under § 1129(b)(2)(A)(i)(II).

## OBJECTIONS

### A.    Failure to Include or Provide for a Secured Claim Renders the Plan Unconfirmable

21.    Section 1129(a)(1) of the Bankruptcy Code requires that the plan comply with the provisions of the Bankruptcy Code, including 11 U.S.C. §§ 1122 and 1123, which require proper classification and treatment of all claims.

22.    The Plan fails to classify or provide any treatment for NYBDC's secured Claim No. 10, in violation of §§ 1122(a), 1123(a)(1), and 1123(a)(5).

23.    By failing to provide for NYBDC's secured Claim No. 10, the Plan does not meet the requirement of § 1129(a)(7) (best interest of creditors), since the Plan would leave NYBDC with no distribution or treatment of Claim No. 10, despite holding a secured interest in estate property.

24.    The Plan's failure to acknowledge or treat NYBDC's secured Claim No. 10 is prejudicial to NYBDC's rights and renders the Plan not feasible or fair, in violation of §§ 1129(a)(3), (a)(11).

### B.    The Proposed Interest Rate Fails to Provide Present Value

25.    A Chapter 11 plan must provide that a secured creditor receive deferred cash payments totaling the present value of its allowed secured claim. See 11 U.S.C. § 1129(b)(2)(A)(i)(II).

26.    The interest rate proposed must compensate for the time value of money and the risk of nonpayment under the plan.

27.     The Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) endorsed a formula approach for setting cramdown interest rates, starting with a national prime rate and adding a risk adjustment (typically between 1–3%).

28.     At the time the Plan was filed, the prime rate was approximately 7.75%, and a reasonable risk adjustment of 2–3% is warranted based on: the Debtor's prior defaults; the speculative nature of the Debtor's projections; the illiquidity or declining value of the collateral; the length of the payout term; and absence of a significant equity cushion.

29.     A rate of 6.03% as proposed by the Debtor does not reflect market realities or compensate for the heightened risk of nonperformance, especially in this case.

30.     The plan must be "fair and equitable" to secured creditors under § 1129(b)(1).

31.     By proposing an artificially low interest rate, the Plan shifts the risk of the Debtor's default onto NYBDC, violating the fair and equitable standard.

32.     The Plan, as proposed, fails to provide the indubitable equivalent of the secured claim and cannot be confirmed over NYBDC's objections.

## RESERVATION OF RIGHTS

33.     NYBDC reserves the right to amend or supplement this Objection, to file further objections, and to appear and be heard at any confirmation hearing in this matter.

## CONCLUSION

WHEREFORE, New York Business Development Corporation d/b/a Pursuit respectfully requests that the Court deny confirmation of the Debtor's Chapter 11 Plan unless and until it properly lists, classifies, and treats Creditor's secured claims in

compliance with the Bankruptcy Code together with such other and further relief as the

Court deems just and proper.


Dated:  October 1, 2025
         Clifton Park, New York

                              BURGESS & ASSOCIATES P.C.


                              /s/ Peter L. Burgess
                              Peter L. Burgess, Esq.
                              *Attorneys for New York Business Development*
                                  *Corporation d/b/a Pursuit*
                              6 Executive Park Drive, Suite C
                              Clifton Park, New York 12065
                              (518) 371-0052
                              pburgess@bapclaw.com

S:\BAPCLAW\3224.010 PCC-Castleton\Objection.Confirmation.10012025.doc

# EXHIBIT 1

**U.S. Bankruptcy Court**

**Northern District of New York**

Notice of Electronic Claims Filing

The following transaction was received from Burgess, Peter on 7/24/2024 at 11:38 AM EDT

File another claim

| | |
|---|---|
| **Case Name:** | Cell-Nique Corporation |
| **Case Number:** | 24-10508-1-rel |
| | Pursuit/NYBDC/SBA/Treasury |
| **Creditor Name:** | 50 Beaver St |
| | Albany NY 12207 |
| **Claim Number:** | 10    Claims Register |

**Amount Claimed:** $457,593.60
**Amount Secured:** $457593.60
**Amount Priority:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**doc05871220240724113508.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1007484561 [Date=7/24/2024] [FileNumber=19212538-0] [8ededf8bcc31431880ea5035fc138a837f73bf44f20469a0e5199db390c0c1e88b5166f0db07790d8ca473cf9cd6e9cd04bbfec665a29e763ca6e75a91ea87f6]]

**24-10508-1-rel Notice will be electronically mailed to:**

Marco B. Koshykar on behalf of Creditor Berkshire Bank
mkoshykar@nhkllp.com, spaulsen@nhkllp.com

Peter A. Pastore on behalf of Debtor Cell-Nique Corporation
papastore@oalaw.com, asullivan@oalaw.com

Teresa Sadutto-Carley on behalf of Creditor TD Bank, N.A.
tsadutto@platzerlaw.com

U.S. Trustee
USTPRegion02.AL.ECF@USDOJ.GOV

**24-10508-1-rel Notice will not be electronically mailed to:**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Cell-Nique Corporation |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of New York |
| Case number | 24-10508-1-rel |

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

New York Business Development Corporation d/b/a Pursuit
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Burgess & Associates P.C. (Atten:  PLB)
Name

6 Executive Park Drive, Suite C
Number        Street

CliftonPark          NY        12065
City                State          ZIP Code

Contact phone (518) 371-0052

Contact email  pburgess@bapclaw.com

Where should payments to the creditor be sent? (if different)

Pursuit (Atten: Justin Nadeau, SVP)
Name

50 Beaver Street
Number        Street

Albany          NY        12207
City                State          ZIP Code

Contact phone (518) 694-8549

Contact email  jnadeau@pursuitlending.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __2__ __9__ __9__ __8__

**7. How much is the claim?**    $_____457,593.60 **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

commercial real estate mortgage loan

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**    Lease and Mortgage

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $ 2,200,000.00

**Amount of the claim that is secured:**    $ 457,593.60

**Amount of the claim that is unsecured:**    $_____0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $ 457,593.60

**Annual Interest Rate** (when case was filed) __5.04__ %

☐ Fixed

☑ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   07/24/2024
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

Name        Peter L. Burgess, Esq.
            First name          Middle name          Last name

Title       Attorney

Company     Burgess & Associates P.C.
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     6 Executive Park Drive, Suite C
            Number      Street
            Clifton Park                            NY          12065
            City                                    State       ZIP Code

Contact phone   518-371-0052                    Email   pburgess@bapclaw.com

Re:    Cell-Nique Corporation
        24-10508-1-rel

## ITEMIZED STATEMENT

**Proof of Claim**
***filed by***
**New York Business Development Corporation d/b/a Pursuit**
**"Loan-1"**

| | |
|---|---|
| Principal Balance | $452,458.61 |
| Interest | $    190.03 |
| Late Fees | $   4,734.96 |
| ACH Reject Fees | $    100.00 |
| Attorney's Fees and Expenses | $    110.00 |
| **Total Amount Due (07/15/2024)** | **$457,593.60** |

**AMENDED AND RESTATED**

**MORTGAGE NOTE**

| | |
|---|---|
| **LENDER:** | **New York Business Development Corporation**<br>50 Beaver Street<br>Albany, New York 12207 |
| **BORROWER:** | **PCC Castleton Corporation**<br>22 Hamilton Way<br>Schodack, New York 12033 |
| **PRINCIPAL SUM:** | **$500,000.00** |
| **DATED:** | **December 14, 2016** |

For value received, the Borrower, jointly and severally, promises to pay to the order of the Lender at the address set forth above, or at such other place as Lender may from time to time designate, the Principal Sum, with interest, in the following manner:

On the date hereof the Borrower shall make one payment of interest on the disbursed principal balance for interest to accrue on the disbursed principal balance through January 1, 2017.

On the 1st day of February, 2017 and on the 1st day of each month thereafter to and including the 1st day of January, 2032, the Borrower shall pay monthly payments of principal and interest, at the Note Rate, each payment being in that amount necessary to amortize the unpaid principal balance at the Note Rate then in effect in equal monthly payments calculated in accordance with a twenty five (25) year amortization schedule.

In addition, the entire unpaid principal balance hereof, together with accrued interest thereon and accrued late charges, if any, and all other sums due hereunder and under the Mortgage (as hereinafter defined), shall be finally due and payable on January 1, 2032 (the "Maturity Date).

The Note Rate shall be set for the first five (5) years to equal the return to an investor on Treasury Constant Maturities adjusted to a constant maturity of 5 years as published in Federal Reserve Statistical Release H.15 (the "Index"), as of the most recent publication of the Index plus 420 basis points. On September 1, 2021 and September 1, 2026, the Note Rate shall be reset to equal the then Index plus 420 basis points.

All payments hereunder shall be applied first to the payment of accrued late payments, if any, then to the payment of interest accrued to the date of the receipt of payment, and the balance, if any, shall be applied in reduction of principal.

Lender shall compute interest on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed. Interest shall accrue from the date of advance of funds until receipt of payment.

In the event that any payment required by this Note on account of the terms hereof, by acceleration or otherwise shall become overdue for a period in excess of ten (10) days a "late charge" of six cents ($.06) for each dollar ($1.00) so overdue may be charged by the holder hereof for the purpose of defraying the expense incident to handling such delinquent payment.

The Borrower agrees that in the event of the happening of any one or more of the following: (1) the breach of any of the covenants and agreements contained in this Note, any Mortgage given to secure the indebtedness evidenced by this Note, or any other document executed by the Borrower (collectively the "Loan Documents"); (2) the occurrence of an Event of Default as defined in the Loan Documents; (3) the dissolution of the Borrower; (4) any petition of bankruptcy being filed by or against the Borrower; (5) the making by the Borrower of an assignment for the benefit of creditors; or (6) the sale or other conveyance of any portion of the premises which are the subject of any mortgage given to secure the indebtedness evidenced by this Note, then the whole of the principal sum or any part thereof, and of other sums of money secured by the Loan Documents shall, forthwith or thereafter, at the option of the Lender, shall become immediately due and payable without demand or notice, and all of the covenants, agreements, terms and conditions of the Loan Documents are hereby incorporated herein with the same force and effect as if herein set forth at length.

Following a default under this Note, the Borrower promises to pay interest on the unpaid balance due under this Note at the Default Rate (as defined herein). The "Default Rate" shall be the Note Rate at the time the Lender declares an Event of Default plus three (3.0%) percent per annum. Upon any change in the applicable Note Rate, the Default Rate shall simultaneously change to correspond with such change in the Note Rate.

The Borrower may prepay this Note, in whole or in part, at any time upon thirty days prior written notice to the Lender and the payment to the Lender of a prepayment fee (the "Prepayment Fee"). The Prepayment Fee shall be equal to five percent (5.0%) of the principal prepayment made during the 1st year of the loan, four percent (4.0%) of the principal prepayment made during the 2nd year of the loan; three percent (3.0%) of the principal prepayment made during the 3rd year of the loan; two percent (2.0%) of the principal prepayment made during the 4th year of the loan, one percent (1.0%) of the principal prepayment made during the 5th year of the loan. There shall be no Prepayment Fee after the end of the 5th year of the loan. All prepayments of principal shall be applied in inverse order of maturity.

Notwithstanding anything to the contrary herein contained, to the extent that the total amount of interest received in any year exceeds the maximum rate permitted by law, then the amount so determined to be in excess shall be applied in reduction of principal of this Note.

The Lender will adjust the payment amount due under this Note at least annually as needed to amortize principal over the remaining term of the note. Each payment due hereunder must be in an amount necessary to amortize the unpaid principal balance at the applicable interest rate then in effect in equal monthly payments calculated in accordance with the applicable stated amortization schedule.

This Note may not be changed or terminated orally.

Presentment for payment, notice of dishonor, protest and notice of protest are hereby waived.

If this Note is placed with an attorney for collection, the Borrower shall pay all reasonable attorney's fees and expenses incurred by Lender in connection therewith.

This Note is given in replacement of and substitution for the that certain Note dated June 14, 2016 made by the Borrower in favor of Hamilton Industrial Corporation in the original principal amount of $900,000 (the "Prior Note") which was assigned to the Lender by Hamilton Industrial Corporation on even date herewith and upon which there is now due and owing the principal amount of $900,000. This Amended and Restated Mortgage Note remains collateralized and secured by that certain Mortgage, Security Agreement and Assignment of Leases and Rents from PCC Castleton Corporation and the Rensselaer County Industrial Development Agency dated June 14, 2016 in the original principal amount of $900,000 recorded with the Rensselaer County Clerk's Office on June 17, 2016 in Book 7848 at Page 163, which mortgage was assigned by Hamilton Industrial Corporation by Assignment of Mortgage dated even date and to be recorded with the Rensselaer County Clerk together with a certain Mortgage Reduction Certificate from the Lender dated even date and to be recorded with the Lender reducing the principal amount of the mortgage to $500,000.

**IN WITNESS WHEREOF**, the undersigned has executed this **MORTGAGE NOTE** as of the day and year first above written.

**PCC CASTLETON CORPORATION**
*a New York Corporation*

By: _____
Daniel Ratner, President

**STATE OF NEW YORK** )
) ss.:
**COUNTY OF ALBANY** )

On the 14th day of December, in the year 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared **DANIEL RATNER**, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

_____
Notary Public

Leesa Naimo-Fredette
Notary Public - State of NY
Registered in Saratoga County
Registration No. 02NA6061310
Commission Expires: 07/16/2019

# COMMERCIAL GUARANTY

**Lender:**       **New York Business Development Corporation**
50 Beaver Street
Albany, New York 12207

**Borrower:**     **PCC Castleton Corporation, a New York Corporation**
22 Hamilton Way
Schodack, New York 12033

**Guarantor:**    **Cell-nique Corporation, a New York Corporation**
22 Hamilton Way
Schodack, New York 12033

**Guarantor:**    **Physicians Capitol Corporation, a Delaware Corporation**
**(fna Physicians Capital Corporation)**
22 Hamilton Way
Schodack, New York 12033

**Guarantor:**    **Cell-nique Corporation, a Delaware Corporation**
22 Hamilton Way
Schodack, New York 12033

**Guarantor:**    **Living Harvest Foods, Inc., a Delaware Corporation**
22 Hamilton Way
Schodack, New York 12033

**Guarantor:**    **Daniel Ratner**
22 Hamilton Way
Schodack, New York 12033

**Date:**         **December 14, 2016**

---

**AMOUNT OF GUARANTY.** The amount of this Guaranty is 100.00% of all amounts due now or later from Borrower to Lender on account of the Indebtedness (as hereinafter defined) of the Borrower.

**CONTINUING UNLIMITED GUARANTY.** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantors absolutely, unconditionally, jointly, and severally, guarantee and promise to pay to the Lender, or its order, in legal tender of the United States of America, 100.00% of any and all of Borrower's liabilities, obligations, debts, and indebtedness to Lender, now existing or hereinafter incurred or created (the "Indebtedness") on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of Guarantor is unlimited, joint and several, and the obligations of Guarantor are absolute, unconditional and continuing irrespective of any lack of validity or enforceability of any agreement, instrument or document evidencing or given in connection with the Indebtedness or any other defense available to Guarantor with respect to this Guaranty.

**NATURE OF GUARANTY.** Guarantor's liability under this Guaranty shall be open and continuous for so long as this Guaranty remains in force. Guarantor intends to guarantee at all times the performance and prompt payment when due, whether at maturity or earlier by reason of acceleration or otherwise, of all Indebtedness. Accordingly, no payments made upon the Indebtedness will discharge or diminish the continuing liability of Guarantor in connection with any remaining portions of the Indebtedness or any of the Indebtedness which subsequently arises or is thereafter incurred or contracted.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all other obligations of Guarantor under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice or revocation must be delivered to Lender at the address of Lender listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty, and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind the estate of Guarantor as to Indebtedness created both before and after the death or incapacity of Guarantor, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other Guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation received by Lender from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and it is specifically acknowledged and agreed by Guarantor that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to written revocation of this guaranty by Guarantor shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the guaranteed Indebtedness remains unpaid and even though the Indebtedness guaranteed may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (a) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (b) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (c) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (d) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other Guarantors on any terms or in any manner Lender may choose; (e) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (f) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (g) to sell, transfer, assign, or grant participations in all or any part of the Indebtedness; and (h) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that to the best of Guarantor's knowledge (a) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (b) this Guaranty is executed at Borrower's request and not at the request of Lender; (c) Guarantor has not and will not, without the prior written consent of Lender, which consent shall not be unreasonably withheld or delayed, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets for less than fair market value or unless in connection with estate planning purposes; (d) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; (e) upon Lender's request, Guarantor will provide to Lender financial and credit information in form reasonably acceptable to Lender, and all such

financial information provided to Lender is true and correct in all material respects and fairly presents the financial condition of Guarantor as of the dates thereof, and no material adverse change has occurred in the financial condition of Guarantor since the date of the financial statements; (f) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition and (g) Guarantor represents, warrants and guaranties that the Note executed by the Borrower was authorized by all applicable and necessary officers and/or members of the Borrower. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (a) to continue lending money or to extend other credit to Borrower; (b) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other Guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (c) to resort for payment or to proceed directly or at once against any person, including Borrower or any other Guarantor; (d) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other Guarantor, or any other person; (e) to pursue any other remedy within Lender's power; or (f) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever. Guarantor also waives any and all rights or defenses arising by reason of (a) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (b) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (c) any disability or other defense of Borrower, of any other Guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (d) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (e) to the extent permitted by law any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced there is outstanding Indebtedness of Borrower to Lender which is not barred by any applicable statute of limitations; or (f) to the extent permitted by law any defenses given to Guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of enforcement of this Guaranty. Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**LENDER'S RIGHT OF SETOFF.** In addition to all liens upon and rights of setoff against the moneys, securities or other property of Guarantor given to Lender by operation of law, Lender shall have, with respect to Guarantor's obligations to Lender under this Guaranty and to the extent permitted by law, a contractual possessory security interest in and a right of setoff against, and Guarantor hereby assigns, conveys, delivers, pledges, and transfers to Lender all of Guarantor's right, title and interest in and to, all deposits, moneys, securities and other property of Guarantor now or hereafter in the possession of or on deposit with Lender, whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding however all IRA, Keogh, and trust accounts. Every such security

interest and right of setoff may be exercised without demand upon or notice to Guarantor. No security interest or right of setoff shall be deemed to have been waived by any act or conduct on the part of Lender or by any neglect to exercise such right to setoff or to enforce such security interest or by any delay in so doing. Every right of setoff and security interest shall continue in full force and effect until such right of setoff or security interest is specifically waived or released by an instrument in writing executed by Lender.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness of Borrower to Lender, whether now existing or hereafter created, shall be prior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the indebtedness of Borrower to Lender. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender hereby is authorized, in the name of Guarantor, from time to time to execute and file financing statements and continuation statements and to execute such other documents and to take such other actions as Lender deems reasonably necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

Amendments: This Guaranty, together with all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing constitute the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Applicable Law: This Guaranty has been delivered to Lender and accepted by Lender in the State of New York. If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Albany County, State of New York. Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other. This Guaranty shall be governed by and construed in accordance with the laws of the State of New York.

Attorneys' Fees; Expenses: Guarantor agrees to pay upon demand all of Lender's costs and expenses, including reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the Court.

Notices: Except for revocation notices by Guarantor, all notices required to be given by either party to the other under this Guaranty shall be in writing and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier, or when deposited in the United States mail, first class postage prepaid, addressed to the party to whom the notice is to be given at the address shown above or to such other addresses as either party may designate to the other in

writing. All revocation notices by Guarantor shall be in writing and shall be effective only upon delivery to Lender as provided above in the section titled "DURATION OF GUARANTY." If there is more than one Guarantor, notice to any Guarantor will constitute notice to all Guarantors. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.

Interpretation:  In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them.  The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty. If a court of competent jurisdiction finds any provision of this Guaranty to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances, and all provisions of this Guaranty in all other respects shall remain valid and enforceable. If any one or more of Borrower or Guarantor are corporations or partnerships, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, or agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Waiver:  Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender, except as otherwise provided herein to the contrary.

**OTHER CONDITIONS.**  All other agreements, either oral or written, are superseded by this "document", there are no terms, representations, or conditions relating to the loan or other matters relating thereto that are not contained in this document and the Borrower specifically affirms that it is not relying upon any such terms, representations, or conditions.

<Signatures on next page>

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY." NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.

Guarantor:      Cell-nique Corporation, a New York Corporation

By: _____
Daniel Ratner, President

Guarantor:      Physicians Capitol Corporation, a Delaware Corporation
(fna Physicians Capital Corporation)

By: _____
Daniel Ratner, President

Guarantor:      Cell-nique Corporation, a Delaware Corporation

By: _____
Daniel Ratner, President

Guarantor:      Living Harvest Foods, Inc., a Delaware Corporation

By: _____
Daniel Ratner, President

Guarantor:      _____
Daniel Ratner

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF ALBANY       )

On the 14th day of December, in the year 2016 before me, the undersigned, a Notary Public in and for said State, personally appeared DANIEL RATNER personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual(s), or the person(s) upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public
Leesa Naimo-Fredette
Notary Public - State of NY
Registered in Saratoga County
Registration No. 02NA6061310
Commission Expires: 07/16/20 19



### Rensselaer County
### Frank J Merola
### County Clerk
### Troy, New York 12180



Volm-8038 Pg-164

60 2016 00506624

Instrument Number: 2016- 00506624

Recorded On: December 16, 2016    As _Reduction_ of Mortgage

Parties: PCC CASTLETON CORPORATION
        To
        NEW YORK BUSINESS DEVELOPMENT CORP          Billable Pages:      1

Recorded By: NORTHWAY ABSTRACT                      Num Of Pages:        2
  Comment: MTG REDUCTION CERTIFICATE

## ** Examined and Charged as Follows: **

| | | | |
|---|---|---|---|
| Assignment or Release of Mort | 45.50 | Coversheet | 5.00 |
| Recording Charge: | 50.50 | | |

---

## ** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For:  Rensselaer County, NY

**File Information:**                               **Record and Return To:**
  Document Number: 2016- 00506624                    NY BUSINESS DEVELOPMENT CORP
  Receipt Number: 1051275                            P O BOX 738
  Recorded Date/Time: December 16, 2016 09:13:03A    ALBANY NY 12201-0738
  Book-Vol/Pg: Bk-R  Vl-8038 Pg-164
  Cashier / Station: R H  /  Cashier Station 3

---



Frank J. Merola
Rensselaer County Clerk



RECORD AND RETURN TO:
NEW YORK BUSINESS DEVELOPMENT CORPORATION
50 BEAVER STREET, P.O. BOX 738
ALBANY, NEW YORK 12201-0738
ATTN: LYNDA M. DEBELL, LOAN ADMINISTRATOR

Doc#: 00506624
Bk: 8038 Pg: 165

## MORTGAGE REDUCTION CERTIFICATE

**THE UNDERSIGNED**, NEW YORK BUSINESS DEVELOPMENT CORPORATION, having an address of 50 Beaver Street, Albany, New York 12207, is the owner and holder of the following mortgage and of the note secured thereby:  Mortgage in the original amount of $900,000.00 from PCC Castleton Corporation and Rensselaer County Industrial Development Agency to Hamilton Industrial Corporation, which Mortgage is dated June 14, 2016 and was recorded in the Rensselaer County Clerk's Office on June 17, 2016 in BK-R VI-7848 Pg. 163, which mortgage was assigned by Hamilton Industrial Corporation to New York Business Development Corporation by Assignment of Mortgage to be recorded with the Rensselaer County Clerk immediately prior hereto (collectively, the "Mortgage"), and in consideration of the sum of one dollar, the receipt of which is hereby acknowledged, **DOES HEREBY CERTIFY,** that the principal sum of the Mortgage is hereby reduced to $500,000.00 with interest thereon.  The Mortgage remains a lien on the premises previously stated and covered thereby only to the extent of the said last mentioned principal sum and interest.

DATED, the 14th day of December, 2016.

NEW YORK BUSINESS
DEVELOPMENT CORPORATION

By: _Nicoleta Augustin_

Nicoleta Augustin, AVP

STATE OF NEW YORK  )
COUNTY OF ALBANY   ) ss.:

On the 14th day of December, 2016 before me, personally appeared NICOLETA AUGUSTIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Leesa Naimo-Fredette
Notary Public - State of NY
Registered in Saratoga County
Registration No. 02NA6061310
Commission Expires: 07/16/2019

# EXHIBIT 2

**U.S. Bankruptcy Court**

**Northern District of New York**

Notice of Electronic Claims Filing

The following transaction was received from Burgess, Peter on 7/24/2024 at 11:40 AM EDT

File another claim

| | |
|---|---|
| **Case Name:** | Cell-Nique Corporation |
| **Case Number:** | 24-10508-1-rel |
| **Creditor Name:** | Pursuit/NYBDC/SBA/Treasury<br>50 Beaver St<br>Albany NY 12207 |
| **Claim Number:** | 11   Claims Register |
| **Amount Claimed:** | $1,952,658.05 |
| **Amount Secured:** | $1724406.40 |
| **Amount Priority:** | |

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**doc05871320240724113532.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1007484561 [Date=7/24/2024] [FileNumber=19212541-0] [9068b69c6f0b15bbfa902b74fd84dc5f80a53e8120190c67743870120ddedbed6a8a5177e8d45e22681a7420c710445aa67dad76431ce443c399ff65950fcf09]]

**24-10508-1-rel Notice will be electronically mailed to:**

Marco B. Koshykar on behalf of Creditor Berkshire Bank
mkoshykar@nhkllp.com, spaulsen@nhkllp.com

Peter A. Pastore on behalf of Debtor Cell-Nique Corporation
papastore@oalaw.com, asullivan@oalaw.com

Teresa Sadutto-Carley on behalf of Creditor TD Bank, N.A.
tsadutto@platzerlaw.com

U.S. Trustee
USTPRegion02.AL.ECF@USDOJ.GOV

**24-10508-1-rel Notice will not be electronically mailed to:**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Cell-Nique Corporation |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Northern District of New York |
| Case number | 24-10508-1-rel |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

New York Business Development Corporation d/b/a Pursuit
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Burgess & Associates P.C. (Atten: PLB)
Name

6 Executive Park Drive, Suite C
Number    Street

CliftonPark          NY          12065
City               State          ZIP Code

Contact phone (518) 371-0052

Contact email pburgess@bapclaw.com

Where should payments to the creditor be sent? (if different)

Pursuit (Atten: Justin Nadeau, SVP)
Name

50 Beaver Street
Number    Street

Albany          NY          12207
City               State          ZIP Code

Contact phone (518) 694-8549

Contact email jnadeau@pursuitlending.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _1_ _0_ _0_ _2_

**7. How much is the claim?**    $_____1,952,658.05    **Does this amount include interest or other charges?**

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

commercial real estate mortgage loan

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:**    Lease and Mortgage

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $    2,200,000.00

**Amount of the claim that is secured:**    $    1,724,406.40

**Amount of the claim that is unsecured:**    $    210,251.63  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $    1,952,658.05

**Annual Interest Rate** (when case was filed)  8.85 %
☐ Fixed
☑ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| | | |
|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   07/15/2024
                   MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | | |
|---|---|---|
| Name | Peter L. Burgess, Esq. | |
| | First name          Middle name          Last name | |
| Title | Attorney | |
| Company | Burgess & Associates P.C. | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 6 Executive Park Drive, Suite C | |
| | Number          Street | |
| | Clifton Park          NY          12065 | |
| | City          State          ZIP Code | |
| Contact phone | 518-371-0052 | Email   pburgess@bapclaw.com |

Re:   Cell-Nique Corporation
      24-10508-1-rel

## ITEMIZED STATEMENT

**Proof of Claim**
***filed by***
**New York Business Development Corporation d/b/a Pursuit
"Loan-2"**

| | |
|---|---|
| Principal Balance | $1,417,752.36 |
| Interest | $   431,199.01 |
| Late Fees | $     32,134.67 |
| Legal Fees | $     71,572.01 |
| **Total Amount Due (07/15/2024)** | **$1,952,658.05** |

S:\BAPCLAW\3224.010 PCC-Castleton\itemized statement POC Loan 2a.doc

**Loan & Security Agreement**

**Date:**                    November 2, 2018

**Borrower:**            PCC CASTLETON CORPORATION, *a New York Corporation*
                              22 Hamilton Way
                              Castleton, New York 12033

**Operating Company:**    CELL-NIQUE CORPORATION, *a New York Corporation*
                              22 Hamilton Way
                              Castleton, New York 12033

**Operating Company:**    CELL-NIQUE CORPORATION, *a Delaware Corporation*
                              22 Hamilton Way
                              Castleton, New York 12033

**Lender:**                NEW YORK BUSINESS DEVELOPMENT CORPORATION
                              50 Beaver Street
                              Albany, New York 12207

**Loan Amount:**        $1,457,500.00

1.      **AMOUNT OF THE LOAN.**         The Borrower, jointly and severally if more than one borrower is applicable, with all obligations under this Loan Agreement ("Agreement"), and all successors and/or assigns, agrees to borrow from the Lender and the Lender agrees to lend to the Borrower, the Loan Amount, upon the terms and conditions set forth in this Agreement (the "Loan"). The Loan shall be evidenced by the Borrower's promissory note in the Loan Amount dated on even date herewith, and payable as set forth therein (the "Note").

The Operating Company, as co-borrower and/or guarantor of the Note, hereby makes on its own behalf each of the foregoing pledges, agreements, acknowledgments, warranties and representations, and agrees to be bound by each of the covenants, restrictions and conditions contained herein as if written to be applicable to the Operating Company, without exception.

2.      **TERMS OF THE LOAN.**         The parties obligations hereunder are and shall remain subject to the terms of that certain Commitment Letter, including all modifications and amendments thereto, issued by the Lender which have been reviewed, understood and accepted by Borrower, and the terms and conditions of all other documents executed in connection with the Loan, and Borrower agrees to comply with any and all Lender requirements, including those that may arise and/or need to be addressed post-closing, including but not limited to certifications and/or documents. Failure to comply in any manner shall be deemed an Event of Default under this Agreement and under all other related and collateralizing documents (collectively, the "Loan Documents").

3.      **REPRESENTATIONS, WARANTIES, COVENANTS AND AGREEMENTS OF BORROWER.** The Borrower represents, warrants, covenants, and/or agrees that:

a.      All financial information provided to the Lender, any participant in the Loan (the "Financial Information) is true, correct, and complete in all material respects and truly represents the financial condition of the Borrower.

b.      There has been no material adverse change in the financial condition, assets or business prospects of the Borrower or, if the Borrower is not a natural person, any change in the ownership or management of the

Inf 5/17

Borrower since the date of the Borrower's application for the Loan except to the extent disclosed to the Lender in writing prior to the date hereof.

c.    The Borrower has good and marketable title to all assets reflected in the financial statements of the Borrower.

d.    The Borrower's assets are not subject to any liens or encumbrances except as disclosed in the Financial Information.

e.    The Borrower has a federal employer identification number and all insurance, licenses, permits, and other approvals necessary to operate the business.

f.    The Borrower is not a party to any agreement, or subject to any restriction, which materially and adversely affects its business, assets or financial condition, or its ability to undertake the Loan as herein contemplated.

g.    To the best of its knowledge, no litigation in any court, arbitration proceeding or proceeding before any commission or other administrative authority is now pending or threatened against the Borrower.

h.    The Borrower has filed all tax and similar returns and has paid or provided for the payment of all taxes and assessments now due and has no knowledge of any claims for taxes which might become a lien on the assets of the Borrower other than real property taxes not yet payable.

i.    The Borrower has not been determined by the Secretary of Homeland Security or the Attorney General to have engaged in a pattern or practice of hiring an alien, recruiting an alien, or referring an alien for a fee for employment in the United States, knowing that the person is an unauthorized alien.

j.    The Note requires the Borrower to give the Lender prior notice of intent to prepay and may require the payment of a prepayment penalty or premium.

k.    In connection with all real property mortgaged to secure the Note or any guaranty of the indebtedness evidenced by the Note (the "Real Property") (i) at the time the Borrower submitted the application for the Loan, the Real Property was in compliance with all environmental laws and regulations pertaining to the environment; (ii) the Borrower has and will continue to comply with all environmental laws and regulations relating to the environment; (iii) except as disclosed in connection with the environmental investigation of the Real Property undertaken in connection with the Loan, the Borrower has no knowledge of any environmental contamination or other violation of environmental laws or regulations at the Real Property; (iv) the Borrower assumes full responsibility for all costs incurred in any clean-up of environmental contamination and agrees to indemnify the Lender against payment of any such costs; and (v) Borrower will promptly notify Lender if the Borrower knows, suspects or believes there may be any environmental contamination at, adjacent to or near the Real Property or if any such property becomes the subject of any investigation or enforcement action by any governmental agency in connection with actual or suspected environmental contamination.

l.    Borrower will promptly pay or discharge all taxes, assessments or charges imposed upon it or any of its property, and all lawful claims for labor and material which, if unpaid, might become a lien of charge upon such property.

m.    [Intentionally omitted.]

n.    The Borrower will provide and maintain hazard and property insurance on all of its property in an amount equal to the replacement value of the property or, if full replacement cost insurance is not available, for the maximum insurable value containing a LENDER'S LOSS PAYABLE

CLAUSE in favor of the Lender and providing for not less than thirty (30) days prior written notice to Lender of policy cancellation.

o.    If Borrower's premises are determined to be in a Designated Federal Flood Hazard Area, Borrower agrees to purchase and maintain Federal Flood Insurance in amounts and coverage equal to the lesser of (1) the amount of the Loan, (2) the insurable value of the property, or (3) the maximum limit of coverage available at the time, during the life of the Loan, when Borrower's location falls within the boundaries of a special flood hazard area and the Federal Flood Insurance becomes available.

p.    The Borrower will reimburse the Lender for any and all insurance premiums paid for insurance by the Lender in the event the Borrower fails to provide evidence of insurance to the Lender. If an Event of Default (as hereinafter defined) shall have occurred and be continuing, then Borrower, upon Lender's request, shall pay to Lender an amount equal to one twelfth of the estimated aggregate annual amount of insurance premiums on all policies of insurance, including but not limited to Life Insurance, required by the Lender and the Loan conditions., on a specified date each month.

q.    The Borrower will obtain and maintain such other types and amounts of insurance as usually carried by entities engaged in the same or similar business, including but not limited to malpractice, dram-shop and products liability insurance.

r.    The Borrower will maintain its property in good repair and condition.

s.    The Borrower will keep proper books, records, and accounts in accordance with generally accepted accounting principals consistently applied and in a manner reasonably satisfactory to the Lender.

t.    The Borrower will furnish year-end statements to the Lender within one hundred twenty (120) days of the Borrower's fiscal year end, which statements shall be <u>audited</u> by an independent certified public accountant, and financial statements for any of the Loan and such additional financial information and/or reports concerning the Borrower or any guarantor of the Loan as the Lender may, from time-to-time, request, including but not limited to reasonable details on job creation and retention by the Borrower and any guarantor.

u.    The Borrower will furnish a copy of the federal tax return (with schedules) or documents requesting an extension for that particular tax year filed by the Borrower and any guarantor to the Lender within one hundred twenty (120) days of the Borrower's fiscal year end. The failure by the Borrower to provide the Lender with a copy of the federal tax return (with schedules) filed by the Borrower within one hundred twenty (120) days of the end of the Borrower's fiscal year shall, entitle the Lender to impose a $250.00 fee, per quarter, for each year's tax returns that are outstanding. This fee shall only be imposed if the tax returns are not on extension. If on extension, the fee shall not be owed.

v.    The Borrower will permit and hereby authorizes the Lender, at the Borrower's expense, to (i) inspect and audit books, records, and papers relating to the Borrower's financial or business condition; (ii) inspect and appraise any of the Borrower's assets; (iii) and allow all government authorities to furnish reports of examinations, or any records pertaining to the Borrower, upon request by the Lender.

w.    The Borrower agrees, to the extent feasible, to purchase only American made equipment and products with the proceeds of the Loan.

x.    No principal who owns at least 20% of the ownership or voting interest of the Borrower is more than sixty (60) days delinquent under the terms of any administrative order, court order or repayment agreement that requires the payment of child support.

y.    The Borrower will reimburse the Lender for expenses incurred in the making and administration of the Loan and the preservation of the Collateral (as defined herein).

z.    The Borrower will not change the ownership structure or interests of the business of the Borrower without the prior express written consent of the Lender. Further, the Borrower will not issue convertible notes or obligations that potentially could change the ownership of the Borrower without the prior express written consent of the Lender. Borrower will also not allow any assignment of assignment of membership/ownership interest without the Lender's prior written consent.

aa.    The Borrower will not sell, lease, pledge, encumber (except by purchase money lien on property acquired after the date of the Note), or otherwise dispose of any of the Borrower's property or assets, except in the ordinary course of business.

bb.    The Borrower, nor the Operating Company, will not execute any contracts for management consulting services or make any distribution of its assets (other than reasonable compensation for services), give any preferential treatment, or make any loan or advance without the written consent of the Lender and SBA. Further, Borrower and/or Operating Company will not reclassify any designated equity in the company to shareholder/member debt following the date of this Agreement, nor take distributions in excess of twenty (20%) percent of reported profits and distributed solely to cover member/shareholder tax liabilities.

cc.    The Borrower will permit the Lender to have access, at all reasonable times, to the properties, files, books and financial records of the Borrower. This includes, but is not limited to, a site-visit by the Lender (or the Lender's representative) to each and every business premises of the Borrower for purposes of confirming the continued operation and activity of the business, location and condition of collateral, current ownership and management of the business, etc.

dd.    The Borrower shall not remove any collateral that secures this Loan or its business operations from the State without the express written permission of the Lender. The Borrower shall not vacate its business location(s) as disclosed to the Lender as of the date of this Agreement, nor remove any collateral from that(those) business location(s) that secures this Loan (except in the normal course of business) without the express written permission of the Lender. Further, the Borrower shall not lease or purchase other business locations without first obtaining the Lender's prior written consent and providing the Lender with a copy of the written signed lease agreement, applicable insurances and landlord agreement/waivers as required by the Authorization. The failure to obtain the Lender's written permission for any and all of the above actions or inactions shall constitute an Event of Default under the Loan and shall entitle the Lender to exercise any and all remedies available to it.

ee.    The Borrower hereby authorizes the Lender to publish details of the Loan. Such information may include: name of the company; address; amount of the loan; use of loan proceeds; number of jobs created/retained.

ff.    Borrower hereby consents and authorizes Lender to obtain its credit report, from a credit reporting agency chosen by Lender, to be used from time to time to evaluate the creditworthiness of Borrower.

gg.    The Borrower agrees to provide the Lender with the contact information of its certified public accountant, to include name, address, phone number and e-mail address, and further authorizes said certified public accountant to furnish and release to the Lender all of the financial

information required by this Agreement to be provided to the Lender by the Borrower.

hh.    The Borrower will notify the Lender upon the occurrence of an Event of Default if it is aware of said Event of Default as provided in this Agreement.

ii.    If any of the Loan proceeds are to refinance debt, including credit card debt, Borrower hereby certifies that the refinancing only includes Borrower's business-related debt.

jj.    [Intentionally omitted.]

kk.    The Borrower is and shall remain either a for-profit sole proprietor or a for-profit entity with 0 to 100 employees that work at least 35-hours a week, including "FTE" or full time equivalent employees meaning (two) 2 employees that each work less than 35-hours a week.

ll.    The Borrower further represents, warrants, covenants and or agrees as provided in **Exhibit "A"** attached hereto and made a part hereof.

mm.    The Borrower further represents, warrants, covenants and or agrees that neither the Borrower nor any guarantor of the Loan or affiliated business is a Money Service Business. "Money Service Business" shall mean a person or entity doing business, whether or not on a regular basis or as an organized business who serves as a check casher, currency dealer or exchanger, issuer of traveler's checks, money orders or stored value cards, seller or redeemer of traveler's checks, money orders, or stored value cards, money transmitter and the U.S. Postal Service provided that the person or entity conducts more than $1,000 in business with one person in one or more transactions (in one or more categories) on any one day. Notwithstanding the foregoing, there is no activity threshold or minimum dollar amount applicable to a money transmitter.

nn.    Loan payments will be automatically withdrawn pursuant to a separate ACH Authorization (the "ACH"). ACH attempts for insufficient funds ("ACH Rejection"), or checks that are otherwise bounced or returned for insufficient funds ("NSF Check"), are subject to a $125.00 fee to be paid by the Borrower. The ACH Rejection and NSF Check fee(s) will appear on the Borrower's monthly Loan Payment Statement. All applicable Borrower Late Charges, as required in the Note or in this Loan Agreement, will continue to be due and payable if Borrower's loan payments are not received by the end of any applicable grace period.

oo.    No additional capital expenditures permitted without Lender's prior written consent and approval.

4.    **SECURITY INTEREST.** As security for the prompt and complete payment of the Loan, the Borrower does hereby grant the Lender a continuing security interest (the "Security Interest") in all the Borrower's personal property and fixtures, wherever located, whether now owned or hereafter arising or acquired and whether or not affixed to any realty including (i) all accounts, chattel paper, investment property, deposit accounts, documents, equipment, farm products, fixtures, furniture, general intangibles (including trademarks, service marks, trade names, patents, copyrights, licenses, and franchises), goods, instruments, inventory, machinery, money, letter of credit rights, causes of action (including tort claims) and other personal property (including agreements and instruments not constituting chattel paper or a document, general intangible or instrument): (ii) all additions, accessions to, substitutions for, or replacements of the foregoing; (iii) all proceeds and products of the foregoing including insurance proceeds from the sale, destruction, loss or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed the foregoing or from that party's insurers, whether due to judgment, settlement or other process; (iv) all accounts, general intangibles, instruments, rents, monies, payments and all other rights arising out of a sale, lease, consignment or other disposition of the foregoing and (v) all business records, records, data and information relating to any of the foregoing and any software or other programs for accessing and manipulating such

information plus all proceeds and products hereof, if any, all replacements, additions and accessions thereto (collectively herein called the "Collateral"). Borrower acknowledges and agrees that, in applying the law of any jurisdiction that at any time enacts all or substantially all of the uniform provisions of Revised Article 9 of the Uniform Commercial Code, the foregoing collateral description covers and includes all assets of Borrower. In furtherance of the Security Interest granted to the Lender, the Borrower covenants and agrees that:

a. The Collateral shall be used exclusively in the business of the Borrower and will not be sold or leased (unless replaced with Collateral of like value and utility free from any liens or adverse claims) except in the ordinary course of the Borrower's business.

b. The Lender is authorized to file such financing statements and other documents which the Lender deems, in its sole discretion, as necessary to perfect and continue the Security Interest without the signature of the Borrower (to the extent such signature is necessary under applicable law) and irrevocably appoints the Lender as attorney-in-fact for the Borrower with full power and authority in the place of the Borrower and in the name of the Borrower or its own name, from time to time in the Lender's discretion, to perform all acts which the Lender deems appropriate to attach, continue, preserve or perfect and continue the Security Interest.

c. The Collateral, and all books and records pertaining to the Collateral, will be kept at the Borrower's principal place of business except and only to the extent that the use of the Collateral at a place(s) other than the Borrower's principal place of business is required or anticipated in the ordinary course of the Borrower's business.

d. The Borrower is the owner of the Collateral free and clear from any adverse claim, lien, security interest or encumbrance except those interests specifically permitted pursuant to the terms of the Commitment Letter.

e. The Borrower will keep the Collateral free and clear from any adverse claim, lien, security interest or encumbrance except those interests specifically permitted pursuant to the terms of the Commitment Letter.

f. The Borrower agrees, upon request by the Lender, that at Borrower's expense, it will promptly assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties. This includes, but is not limited to, a site-visit by the Lender (or the Lender's representative) to each and every business premises of the Borrower for purposes of confirming the condition and location of the Collateral.

g. Until the Lender sends notice to the Borrower as contemplated in the next sentence, the Borrower shall continue to collect, at its own expense, all accounts and the undersigned may take (and, at the Lender's direction, shall take) such actions as the Borrower or the Lender may deem necessary or advisable to enforce collection of the accounts. The Lender shall have the right any time after prior written notice to Borrower that the Lender in good faith believes that the prospect of payment of the Loan in the normal course, or in the collection of the accounts is impaired and upon written notice to the Borrower of its intentions to do so, to notify the account debtors and the obligors to pay all accounts directly to the Lender and, upon such written notification and at the expense of the Borrower, to enforce collection of any such accounts, and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Borrower might have done. After receipt by the Borrower of such notice from the Lender, (i) all amounts and proceeds (including instruments) received by the Borrower in respect of the accounts shall be received for the benefit of the Lender hereunder, shall be segregated from other funds of the undersigned and shall be immediately paid over to the Lender in the same form as so received (with any necessary endorsement). If no Event of Default shall have occurred and be continuing, the Lender may hold such collections as cash collateral or release the same to the Borrower.

h.  Upon the occurrence of an Event of Default that is unremedied for more than sixty (60) days, the Borrower hereby authorizes the Lender to open and dispose of all mail addressed to Borrower and to notify postal authorities to change the address for delivery thereof to such address as the Lender may designate.

**5.    NO OBLIGATION.**    The exercise by Lender of, or failure to so exercise, any authority granted to the Lender in this Agreement shall, in no manner, affect the liability of the Borrower or any guarantor to the Lender hereunder or under the Note or any other Loan Documents and provided further, that the Lender shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and it shall be without liability for any act or failure to act in connection with the collection of, or the preservation of the Collateral.  In addition, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code (whether or not the Code is in effect in the jurisdiction where rights and remedies are assured).

**6.    EVENTS OF DEFAULT.**    Any one of the following shall constitute a default hereunder and, if not cured during the applicable grace period, shall constitute an event of default hereunder:

a.  The failure to pay the Note in accordance with its terms.
b.  The breach of any covenant or obligation of the Borrower as set forth in this Agreement or in any other Loan Documents that is not cured within thirty (30) days after receipt of written demand by the Lender.
c.  The falsity of any material representation or warranty of the Borrower in connection with the Loan.
d.  The failure by the Borrower to comply with any terms or requirements of the Commitment Letter.
e.  A material change in the conduct of the Borrower's business or its prospects for success.
f.  Failure to comply with any and all Lender requirements, including those that may arise and/or need to be addressed post-closing, including but not limited to life insurance, certifications, endorsements, documents, and/or amendments as required by the Lender.

**7.    WAIVER.**    No waiver by Lender of any default shall operate as a waiver of any other default of the same default on a future occasion.  Borrower agrees that no delay by Lender in exercising any of its rights hereunder shall be deemed to constitute a waiver thereof.  The powers and remedies given hereby shall not be exclusive of any other powers or remedies available to the Lender.  No course of dealings between the Lender and the Borrower or any guarantor of the Loan, and no delay on the part of the Lender in exercising any rights with respect to any default shall operate as a waiver of any rights of the Lender.

**8.    SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS, AND AGREEMENTS.**    All representations and warranties, covenants and agreements in this Agreement or any certificate or document delivered in connection with this Agreement or pursuant hereto shall survive the making of the Loan provided for herein and shall continue in full force and effect so long as the Note is outstanding.  Any partial invalidity of the provisions hereof shall not invalidate the remaining portions hereof.

**9.    NOTICES AND DEMANDS.**    Any notices or demands required by this agreement, the Note or Loan Documents, shall be in writing and delivered personally or mailed to the party entitled to such notice or demand at the address set forth set forth in the first paragraph hereof, or at such other address as either party may notify the other in writing.

**10.    MISCELLANEOUS.**    This Agreement shall bind and inure to the benefit of the parties, their respective legal representatives, successors and assigns, except that the Borrower may not assign or transfer its rights without prior written consent of the Lender.  If any part of this

Agreement is found to be void or unenforceable, the remaining provisions shall nevertheless be binding. The headings of this Agreement are inserted only for purpose of convenient reference, and shall not be used in interpreting this Agreement. In construing this Agreement, feminine pronouns shall be substituted for those masculine in form (and vice versa), and plural terms shall be substituted for singular and singular for plural where the context so requires. This Agreement may be executed in several counter parts, each of which shall be considered a legal original for all purposes. Any counterpart signed by both parties may be introduced into evidence in any action or proceeding without having to produce or account for the others. Likewise, this Agreement may be introduced into evidence by production of separate counterparts which collectively contain signatures of all parties and which are otherwise identical in all material respects. One or more parties may transmit his signature on this Agreement via telecopy, facsimile or other form of electronic transmission, and that such signature shall be binding and have the same effect as a manual signature upon the original.

      **11.**   **CORRECTIVE/ADDITIONAL DOCUMENTS or ACTIONS.** The Borrower shall, within seven (7) days of a written request by the Lender, execute any document(s) or take any action, that the Lender determines, in their sole discretion, should have been executed at or before the closing of this loan, or require correction. Failure to respond promptly to any such written request by the Lender may be considered an Event of Default by the Lender.

      Notwithstanding the foregoing, the Borrower hereby appoints the Lender and/or its attorneys as its/their attorneys-in-fact to amend, correct, supplement or otherwise modify any of the Loan Documents only for the purpose of correcting any errors, typographical or otherwise, made therein, so as to bring the same into conformance with the Lender's Commitment Letter and the requirements of the Lender thereunder. Lender acknowledges that it is not authorized to modify any material terms of any Loan Documents without the Borrower's written approval.

      **12.**   **COUNTERPARTS.**   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

**<Signatures on next page>**

**IN WITNESS WHEREOF,** the parties hereto have caused this **LOAN AND SECURITY AGREEMENT** to be executed and effective as of the day and year first written above.

**PCC CASTLETON CORPORATION,** *a New York Corporation*

By: _____
Daniel Ratner, President

**CELL-NIQUE CORPORATION,** *a New York Corporation*

By: _____
Daniel Ratner, President

**CELL-NIQUE CORPORATION,** *a Delaware Corporation*

By: _____
Daniel Ratner, President

**NEW YORK BUSINESS DEVELOPMENT CORPORATION**

By: _____
Nicoleta Augustin, AVP

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF ALBANY           )

On the ___8___ day of November, in the year 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared DANIEL RATNER, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

Leesa Sa

Notary Public
Registered in Saratoga County
Registration No. 02NA6061310
Commission Expires: 07/16/20_19_

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF ALBANY           )

On the ___8___ day of November, in the year 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared NICOLETA AUGUSTIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

Leesa Naimo-Fredette
Notary Public - State of NY
Registered in Saratoga County
Registration No. 02NA6061310
Commission Expires: 07/16/20_19_

lnf 8/2016

## Exhibit "A"

Borrower is an Enterprise with 0 to 100 Employees. Employees mean full-time employees (35 hours per week) and FTE Employees.

"Enterprise" means any of (i) a sole proprietor engages in a profit- making venture or (ii) an entity engaged in profit-making venture, or (iii) a non-for-profit corporation.

"FTE Employee" or full-time-equivalent employee means (collectively) two employees, both of which work less than 35 hours per week.

Borrower is not a "Non-Eligible Borrower" which means the following:

a)  With respect to school and religious organizations, an entity that fails to satisfy any one of the following requirements:
    i)      The organization is a 501(c)(3) corporation organized under the laws of the State;
    ii)     The organization must be receiving or must demonstrate unequivocally that it is eligible to receive federal or state funding;
    iii)    The organization has no intention of using the proceeds of the Loan in the furtherance of religious purposes or to promote religious activities or believes; and/or
    iv)     If Loan proceeds are to be used to improve the facility for community use, the facility must be open to the general community without denominational restrictions.

b)  With respect to natural person, an officer, director, employee or principal shareholder of Lender ( as such terms are defined in applicable federal banking regulations, a "Lender–Related Natural Person") or an immediate family member of any Lender-Related Natural Person; or

c)  An entity for which (i) a Lender-related Natural Person or (ii) an immediate family member if a Lender-Related Natural Person is an officer, director, employee, partner, member or shareholder of such entity.

A Borrower's main place of business or its main place of operations is located within the State of New York.

At Least 80% of Borrower's business or operations occur within the State of New York.

If a Borrower is an entity, Borrower must be organized in accordance with the laws of the State of New York.

# NEW YORK BUSINESS DEVELOPMENT CORPORATION

### AMENDED AND RESTATED
### MORTGAGE NOTE

| | |
|---|---|
| **LENDER:** | **New York Business Development Corporation**<br>50 Beaver Street<br>Albany, New York 12207 |
| **BORROWER:** | **PCC Castleton Corporation,** *New York Corporation*<br>22 Hamilton Way<br>Castleton, New York 12033 |
| **BORROWER:** | **Cell-Nique Corporation,** *New York Corporation*<br>22 Hamilton Way<br>Castleton, New York 12033 |
| **BORROWER:** | **Cell-Nique Corporation,** *Delaware Corporation*<br>22 Hamilton Way<br>Castleton, New York 12033 |
| **PRINCIPAL SUM:** | **$ 1,457,500.00** |
| **DATED:** | Originally dated October 27, 2017; Restated as of November 8, 2018 |

**For value received,** the Borrower promises to pay to the order of the Lender at the address set forth above, or at such other place as Lender may from time to time designate, the Principal Sum, with interest, in the following manner:

On October 27, 2017, the Borrower shall pay interest on the disbursed principal amount through November 1, 2017.

On the 1st day of December, 2017 and on the 1st day of each month thereafter to and including the 1st day of November, 2018, the Borrower shall pay monthly payments of interest only on the disbursed principal amount.

On the 1st day of December, 2018 and on the 1st day of each month thereafter to and including the 1st day of November 2028, the Borrower shall pay monthly payments of principal and interest, each payment being in that amount necessary to amortize the unpaid principal balance at the Interest Rate then in effect in equal monthly payments calculated in accordance with a twenty (20) year amortization schedule from the restated date of this Note.

The entire unpaid principal balance hereof, together with accrued interest thereon and accrued late charges, if any, and all other sums due hereunder and under the Mortgage (as hereinafter defined), shall be finally due and payable on **November 1, 2028 (the "Maturity Date).**

Prior to November 8, 2018, the Interest Rate shall be variable and equal to the Prime Rate as published in the "Money Rates" section of the <u>Wall Street Journal</u> plus 400 basis points, adjusted on and as of the first day of each month based on the Prime Rate in effect on the last day of the preceding month.

On November 8, 2018, the Interest Rate shall be fixed as to equal the return to an investor on Treasury Constant Maturities adjusted to a constant maturity of 10 years as published in Federal Reserve Statistical Release H.15 (the "Index"), as of the most recent publication of the Index plus 570 basis points.

All payments hereunder shall be applied first to the payment of accrued late payments, if any, then to the payment of interest accrued to the date of the receipt of payment, and the balance, if any, shall be applied in reduction of

principal.

Lender shall compute interest on the basis of a year of three hundred sixty (360) days for the actual number of days elapsed. Interest shall accrue from the date of advance of funds until receipt of payment.

In the event that any payment required by this Note on account of the terms hereof, by acceleration or otherwise shall become overdue for a period in excess of ten (10) days a "late charge" of six cents ($.06) for each dollar ($1.00) so overdue may be charged by the holder hereof for the purpose of defraying the expense incident to handling such delinquent payment.

The Borrower agrees that in the event of the happening of any one or more of the following: (1) the breach of any of the covenants and agreements contained in this Note, any Mortgage given to secure the indebtedness evidenced by this Note, or any other document executed by the Borrower (collectively the "Loan Documents"); (2) the occurrence of an Event of Default as defined in the Loan Documents; (3) the dissolution of the Borrower; (4) any petition of bankruptcy being filed by or against the Borrower; (5) the making by the Borrower of an assignment for the benefit of creditors; or (6) the sale or other conveyance of any portion of the premises which are the subject of any mortgage given to secure the indebtedness evidenced by this Note, then the whole of the principal sum or any part thereof, and of other sums of money secured by the Loan Documents shall, forthwith or thereafter, at the option of the Lender, shall become immediately due and payable without demand or notice, and all of the covenants, agreements, terms and conditions of the Loan Documents are hereby incorporated herein with the same force and effect as if herein set forth at length.

Following a default under this Note, the Borrower promises to pay interest on the unpaid balance due under this Note at the Default Rate (as defined herein). The "Default Rate" shall be the Interest Rate at the time the Lender declares an Event of Default plus three (3.0%) percent per annum. Upon any change in the applicable Interest Rate, the Default Rate shall simultaneously change to correspond with such change in the Interest Rate.

The Borrower may prepay this Note, in whole or in part, at any time upon thirty days prior written notice to the Lender and the payment to the Lender of a prepayment fee (the "Prepayment Fee"). The Prepayment Fee shall be equal to five percent (5.0%) of the principal prepayment made during the 1st year of the loan, four percent (4.0%) of the principal prepayment made during the 2nd year of the loan; three percent (3.0%) of the principal prepayment made during the 3rd year of the loan; two percent (2.0%) of the principal prepayment made during the 4th year of the loan, one percent (1.0%) of the principal prepayment made during the 5th year of the loan. There shall be no Prepayment Fee after the end of the 5th year of the loan. All prepayments of principal shall be applied in inverse order of maturity.

Notwithstanding anything to the contrary herein contained, to the extent that the total amount of interest received in any year exceeds the maximum rate permitted by law, then the amount so determined to be in excess shall be applied in reduction of principal of this Note.

The Lender will adjust the payment amount due under this Note at least annually as needed to amortize principal over the remaining term of the note. Each payment due hereunder must be in an amount necessary to amortize the unpaid principal balance at the applicable interest rate then in effect in equal monthly payments calculated in accordance with the applicable stated amortization schedule.

This Note may not be changed or terminated orally.

Presentment for payment, notice of dishonor, protest and notice of protest are hereby waived.

Borrower agrees to submit to the jurisdiction of the courts of Albany County, State of New York. This Note and all documents evidencing or securing this obligation will be construed in accordance with the laws of the State of New York. The Lender may use local or other state procedures for purposes of recording documents, giving notice, foreclosing liens, and other necessary purposes.

If this Note is placed with an attorney for collection, the Borrower shall pay all reasonable attorney's fees and expenses incurred by Lender in connection therewith.

POWER TO CONFESS JUDGMENT.

The Borrower hereby irrevocably appoints and empowers any attorney of any court of record, after the occurrence of any Event of Default hereunder, to appear for the Borrower and, with or without complaint filed, confess judgment, or a series of judgments, against the Borrower in favor of the Lender or any holder hereof for the entire principal balance of this Note, all accrued interest and all other amounts

due hereunder, together with costs of suit and reasonable legal and administrative fees, and for doing so, this Note or a copy verified by affidavit shall be a sufficient warrant. The Borrower hereby forever waives and releases all errors in said proceedings and all rights of appeal and all relief from any and all appraisement, stay or exemption laws of any state now in force or hereafter enacted. Interest on any such judgment shall accrue at the Default Rate.

No single exercise of the foregoing power to confess judgment, or a series of judgments, shall be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, but the power shall continue undiminished and it may be exercised from time to time as often as the Lender shall elect until such time as the Lender shall have received payment in full of the debt, interest and costs. Notwithstanding the attorney's commission provided for in the preceding paragraph (which is included in the warrant for purposes of establishing a sum certain), the amount of attorneys' fees that the Lender may recover from the Borrower shall not exceed the actual attorneys' fees incurred by the Lender.

**IN WITNESS WHEREOF**, the undersigned has executed this **AMENDED AND RESTATED MORTGAGE NOTE** as of the day and year first above written.

**PCC CASTLETON CORPORATION**, *a New York Corporation*

By: _____
Daniel Ratner, President

**CELL-NIQUE CORPORATION**, *a New York Corporation*

By: _____
Daniel Ratner, President

**CELL-NIQUE CORPORATION**, *a Delaware Corporation*

By: _____
Daniel Ratner, President

STATE OF NEW YORK            )
                             ) ss.:
COUNTY OF ALBANY             )

On the $8$ day of November, in the year 2018, before me, the undersigned, a Notary Public in and for said State, personally appeared, DANIEL RATNER, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their capacities, and that by their signatures on the instrument, the individuals, or the person upon behalf of which the individuals acted, executed the instrument.

_____
Notary Public

Leesa Naimo-Fredette
Notary Public - State of NY
Registered in Saratoga County
Registration No. 02NA6061310
Commission Expires: 07/16/20_19_



# RENSSELAER COUNTY – STATE OF NEW YORK
## FRANK MEROLA COUNTY CLERK
### 105 THIRD STREET, TROY, NEW YORK 12180

---

## COUNTY CLERK'S RECORDING PAGE
### ***THIS PAGE IS PART OF THE DOCUMENT – DO NOT DETACH***



**BOOK/PAGE:** 8383 / 197
**INSTRUMENT #:** 2017-526332

| Recording: | |
|---|---|
| Cover Page | 5.00 |
| Recording Fee | 190.00 |
| Cultural Ed | 14.25 |
| Records Management - Coun | 1.00 |
| Records Management - Stat | 4.75 |
| Sub Total: | 215.00 |

**Receipt#:** 1104934
**Clerk:** RAH
**Rec Date:** 12/13/2017 11:44:29 AM
**Doc Grp:** RP
**Descrip:** MORTGAGE
**Num Pgs:** 40
**Rec'd Frm:** NORTHWAY ABSTRACT

| Mortgage Tax | |
|---|---|
| Basic | 0.00 |
| Additional | 0.00 |
| Special Additional | 0.00 |
| Local | 0.00 |
| Sub Total: | 0.00 |

**Party1:** PCC CASTLETON CORPORATION
**Party2:** NEW YORK BUSINESS DEVELOPMENT CORP
**Town:** SCHODACK

| Total: | 215.00 |
|---|---|

**** NOTICE: THIS IS NOT A BILL ****

***** Mortgage Tax *****
**Serial #:** DI-3520
**1-2 Family Home**
**Mtg Amt:** 0.00

| Total: | 0.00 |
|---|---|

**WARNING***
I hereby certify that the within and foregoing was recorded in the Rensselaer County Clerk's Office, State of New York. This sheet constitutes the Clerks endorsement required by Section 316 of the Real Property Law of the State of New York.

Frank Merola
Rensselaer County Clerk

Record and Return To:

NORTHWAY ABSTRACT BOX
805 RT 146
CLIFTON PARK NY 12065

*NTA17060270*
*NTA17060278R*

# NEW YORK BUSINESS DEVELOPMENT CORPORATION

### RECORD AND RETURN TO:
NEW YORK BUSINESS DEVELOPMENT CORPORATION
50 BEAVER STREET, P.O. BOX 738
ALBANY, NEW YORK 12201-0738
ATTN: Leesa Naimo-Fredette

---

## MORTGAGE, SECURITY AGREEMENT AND
## ASSIGNMENT OF LEASES AND RENTS

Instr # 2017-526332
Bk 8383   Pg: 197

| | |
|---|---|
| **MORTGAGOR:** | **PCC Castleton Corporation (herein, the "Company")**<br>22 Hamilton Way, Schodack Landing<br>Castleton, New York 12033 |
| **AGENCY:** | **Rensselaer County Industrial Development Agency (herein, the "Agency")**<br>1600 Seventh Avenue, #5<br>Troy, New York 12180 |
| **MORTGAGEE:** | **New York Business Development Corporation**<br>50 Beaver Street<br>Albany, New York 12207 |
| **PRINCIPAL SUM:** | **$1,457,500.00** |
| **PREMISES:** | **22 Hamilton Way, Schodack, New York**<br>County of Rensselaer, State of New York<br>SBL: 198.-4-1.11 |
| **DATED:** | Nov 14 , 2017 |

---

**MORTGAGE** made as of the 14 day of Nov , 2017 (this "Mortgage"), by PCC Castleton Corporation, a New York corporation with offices at 22 Hamilton Way, Castleton, New York 12033 (the "Mortgagor") and **RENSSELAER COUNTY INDUSTRIAL DEVELOPMENT AGENCY**, a public benefit corporation organized and existing under the laws of the State of New York having an office for the transaction of business located at 1600 Seventh Avenue, Troy, New York 12180, party of the second part (the "Agency") in favor of **NEW YORK BUSINESS DEVELOPMENT CORPORATION**, having an office at 50 Beaver Street, Albany, New York 12207 (the "Mortgagee").

**PRELIMINARY STATEMENTS.** (a) The Mortgagor is indebted to the Mortgagee in the consolidated principal amount of **$1,457,500.00** (the "**Loan**"). To evidence its indebtedness to the Mortgagee arising from the Loan, the Mortgagor has this day executed and delivered to the Mortgagee its Mortgage Note bearing even date herewith (such note, and any note delivered in substitution therefor, replacement thereof, or otherwise in modification or amendment thereof, being the "**Note**").

(b) the Agency and the Mortgagor have entered into a "straight-lease transaction" within the meaning of the Act (as defined in the IDA Lease referred to below) pursuant to the following documents: (i) a certain Lease Agreement, dated as of June 14, 2016, by and between the Mortgagor and the Agency (such Company Lease Agreement as amended from time to time being the "**Company Lease**") and (ii) a certain Lease Agreement, dated as of June 14, 2016, by and between the Agency and the Mortgagor (such Lease Agreement as amended from time to time being the "**Agency Lease**" and together with the Company Lease, the "Agency Leases").

1

GRANTING CLAUSE. NOW, THEREFORE, in order to secure the punctual payment and performance by the Mortgagor when due of all liabilities and obligations of the Mortgagor to the Mortgagee now or hereafter becoming due under the Note and this Mortgage, whether at stated maturity, by acceleration or otherwise and whether for principal, interest, fees, expenses or otherwise (collectively, the **"Obligations"**), the Mortgagor hereby mortgages, conveys, assigns, pledges, grants a security interest in and the Agency hereby mortgages, conveys, pledges and grants a security interest in, transfer and set over to the Mortgagee, all of the Mortgagor's and the Agency's respective estates, rights, titles and interests in, to and under, or derived from the following property (such property, being referred to herein collectively as the **"Mortgaged Premises"**):

I. All those certain lot(s), pieces or parcels of land more particularly described in Schedule A hereto, the easements, rights, privileges, tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining, and the reversion and the remainder thereof; and all of the estate, right, title, interest, claim or demand of the Mortgagor and the Agency therein and in and to any land lying in the bed of any street, road or avenue, open or proposed, in front of, adjoining or adjacent to the Mortgaged Premises, to the center line thereof, either at law or in equity, in possession or expectancy, now or hereafter acquired (all of the foregoing being referred to herein collectively as the **"Land"**).

II. All buildings, facilities, structures, and other improvements and additions thereto now or hereafter located, erected or placed upon the Land or any part thereof (the **"Improvements"**) and, to the extent permitted by law, the name or names, if any, now or hereafter used for each Improvement, and the good will associated therewith;

III. All machinery, devices, fixtures, apparatus, interior improvements, appurtenances, and equipment of every kind whatsoever now or hereafter attached to or placed in or upon the Mortgaged Premises or the Improvements, or any part thereof, or used or procured for use in connection with the operation of the Mortgaged Premises or the Improvements, or any part thereof, or any business conducted thereon (except for fixtures and personal property that are the property of tenants of Leases), and all replacements thereof, substitutions therefor, additions and accessions thereto and proceeds thereof (all of the foregoing being referred to herein collectively as the **"Building Equipment"**);

IV. All furniture, furnishings, decorations, chattels and other personal property now or hereafter in, on or at the Mortgaged Premises or the Improvements (except for trade fixtures, furniture and furnishings that are the property of tenants of Leases and excluding furniture, furnishings decorations, and chattels which are used exclusively for consumer or household family purposes), and all replacements thereof, substitutions therefor, additions and accessions thereto and proceeds thereof (all of the foregoing being referred to herein collectively as the **"Furnishings"**);

V. All insurance or other proceeds (excluding, however, insurance for the benefit of the Agency) for damage done to the Improvements, Building Equipment or Furnishings, and all awards heretofore or hereafter made to or for the account of Mortgagor and/or the Agency for the permanent or temporary taking in condemnation or by eminent domain of the Mortgaged Premises, or any part thereof, or any lesser estate in, or easement appurtenant to, the Mortgaged Premises (including, without limitation, any awards for change of grade of streets), all of which proceeds and awards are hereby assigned to Mortgagee, subject to the further provisions of this Mortgage;

VI. All leases, subleases, occupancy agreements, possession agreements, licenses, and any and all other documents or agreements (other than the Company Lease and the Agency Lease) affecting or otherwise relating to the use or occupancy of the Mortgaged Premises now or hereafter entered into (all of the foregoing, except as excluded above, as each of the same may be amended or otherwise modified from time to time being referred to herein collectively as the **"Leases"**) and all of the rents, income, receipts, revenues, issues, benefits, proceeds, royalties, deposits (including security deposits) and profits (other than rents and other payments made or required to be made to the Agency pursuant to the Company Lease, the Agency Lease) derived from or otherwise relating to the use or occupancy of the Mortgaged Premises (all of the foregoing, except as excluded above, being referred to herein collectively as the **"Rents"**), all of which are hereby assigned to the Mortgagee, subject to the further provisions of this Mortgage;

VII. All **"general intangibles"** (as such term is defined in the Code) now existing or hereafter acquired or created in any way relating to the Mortgaged Premises or any part thereof, and all licenses, trade names, good will and books and records related to or used in connection with the operation of the Mortgaged Premises, or any part thereof, or of any business conducted thereon, and all unearned premiums, accrued or to accrue under all insurance policies now or hereafter obtained by the Mortgagor and/or the Agency in accordance with the provisions of this Mortgage and the proceeds of all of the foregoing (excluding, however, insurance for the benefit of the Agency); and

VIII. All air rights, water rights, mineral rights, ditches, ditch rights, reservoirs and reservoir rights appurtenant to, affecting, located on or used in connection with the Mortgaged Premises, whether existing or hereafter acquired or created,

TO HAVE AND TO HOLD the Mortgaged Premises, together with all rights, hereditaments and appurtenances in

2

any way appertaining or belonging thereto, unto the Mortgagee, its successors and assigns forever for the uses set forth herein.

And the Mortgagor hereby covenants and agrees with the Mortgagee as follows:

## ARTICLE I
## CERTAIN DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. **Certain Defined Terms.** As used in this Mortgage, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Audits**" has the meaning specified in Section 4.06.

"**Award**" has the meaning specified in Section 3.07(b)

"**Bankruptcy Code**" means the federal Bankruptcy Code, Title 11 of the United States Code, as amended.

"**Building Equipment**" has the meaning specified in the Granting Clause.

"**Code**" means the Uniform Commercial Code in effect in New York from time to time.

"**Collateral**" has the meaning specified in Section 3.12(a).

"**Debt**" means (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services, (iv) obligations as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, and (v) obligations under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (iv) above.

"**Default Rate**" means a rate of interest equal at all times to three (3%) percent per annum above the rate of interest otherwise payable under the Note but in no event in excess of the maximum rate permitted by applicable law.

"**Environment**" means any surface or subsurface water, water vapor, surface or subsurface land, air, fish, wildlife, microorganisms and all other natural resources.

"**Environmental Laws**" means any law, ordinance, rule or regulation from time to time enacted, adopted, issued or promulgated by any federal, state or local governmental authority, department or agency, whether now existing or hereafter enacted, regulating or purporting to regulate the possession, use, manufacture, generation, treatment, storage (including underground storage tanks), transport, handling, disposal distribution or sale of any Hazardous Substance by any person and at any location, including but in no event limited to the National Environmental Policy Act of 1969, 42 USC Sec. 4321 et seq., the Comprehensive Environmental Response Compensation and Liability Action of 1980, 42 USC Sec. 9601 et seq., the Superfund Amendments and Reauthorization Act of 1986, (Pub. L. 99-499), the Resource Conservation and Recovery Act, 42 USC Sec. 3251 et seq., the Clean Water Act, 33 USC Sec. 1251 et seq., the Clean Air Act, 42 USC Sec. 7401 et seq., the Toxic Substances Control Act, 15 USC Sec. 2601 et seq., the Coastal Zone Management Act, 16 USC Sec. 1451 et seq., the Marine Protection, Research and Sanctuaries Act, 16 USC Sec. 1431 et seq., and all laws, regulations and rules adopted, issued or promulgated by the U.S. Environmental Protection Agency, and all laws, ordinances, regulations and rules enacted, issued, adopted or promulgated by any other federal, state or local governmental authority or agency having jurisdiction over the Mortgagor, the Mortgaged Premises or the operations formerly, presently, or intended to be, conducted thereon.

"**Environmental Permits**" means all permits, licenses, approvals, authorizations, consents or registrations required by any applicable Environmental Law in connection with the ownership, use and/or operation of the Mortgaged Premises, including, without limitation, those required for the disposal, distribution, generation, handling, manufacture, possession, processing, production, sale, storage, treatment, transport or use of Hazardous Substances.

"**Event of Default**" has the meaning specified in Section 6.01.

"**GAAP**" means generally accepted accounting principles in the United States.

3

"Guarantor" means any Person who at any time has executed and delivered a Guaranty.

"Guaranty" means any instrument, document or agreement pursuant to which any Person has guaranteed, assumed or become directly or indirectly liable for all or any portion of the Obligations.

"Hazardous Substances" means any material, whether animate or inanimate, raw, processed or waste byproduct, which in itself or as found or used, is potentially toxic, noxious or harmful to the health or safety of human or animal life or vegetation, regardless whether such material be found on or below the surface of the ground, in any surface or underground water, or airborne in ambient air or in the air inside of any structure built or located upon or below the surface of the ground, or in any machinery, equipment or inventory located or used in any such structure, including but in no event limited to all hazardous materials, hazardous wastes, toxic substances, infectious wastes, pollutants and contaminants from time to time defined or classified as such under any Environmental Law regardless of the quantity found, used, manufactured or removed from a given location.

"Impositions" means all duties, taxes, water and sewer rents, rates and charges, assessments (including, but not limited to, all assessments for public improvements or benefit), charges for public utilities, excises, levies, license, permit fees, use fees for vaults, chutes and public sidewalks and other charges, ordinary or extraordinary, whether foreseen or unforeseen, of any kind whatsoever, together with all penalties and interest accruing thereon which prior to or during the term of this Mortgage have been or are laid, levied, assessed or imposed upon or become due and payable out of or in respect of, or become a lien on the Mortgaged Premises, or any part thereof or appurtenances thereto, or which are levied or assessed against the rent and income received by Mortgagor from the Leases by virtue of any law, ordinance or regulation in effect or issued by, from time to time, any governmental or quasi-governmental agency or authority.

"Improvements" has the meaning specified in Granting Clause II.

"Land" has the meaning specified in Granting Clause I.

"Leases" has the meaning specified in Section 5.01.

"Loan" has the meaning specified in the Preliminary Statement.

"Mortgaged Premises" has the meaning specified in the preamble hereof.

"Mortgagee" shall mean the Mortgagee named herein or at any given time the holder or holders of the Note and Mortgage.

"Mortgagor" shall mean the Mortgagor named herein, any subsequent owner or owners of the Mortgaged Premises, and its or their respective heirs, successors and assigns, but shall not include the Agency.

"Note" has the meaning specified in the Preliminary Statement.

"Obligations" has the meaning specified in the Granting Clause.

"Permitted Mortgages" means the mortgages set forth in Schedule "B" annexed hereto, if any

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture or other entity, or a government or any political subdivision or agency thereof.

"Release" means any discharging, disposing, emitting, leaking, pumping, pouring, emptying, injecting, escaping, leaching, dumping or spilling of any Hazardous Substance (whether intentional or accidental) into the Environment (including, without limitation, the abandonment or discarding of barrels, containers and other closed receptacles).

"Rents" has the meaning specified in Granting Clause VI.

"Taking" has the meaning specified in Section 3.07(a).

SECTION 1.02. Computation of Time Periods. In this Mortgage in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each

4

means "to but excluding".

SECTION 1.03.  Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP consistently applied.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

The Mortgagor represents and warrants that:

SECTION 2.01.  Warranty of Title, Etc.  (i) The Mortgagor has and will have good, marketable and insurable fee simple title to the Mortgaged Premises, free and clear of all liens, charges and encumbrances (other than the Permitted Mortgages) of every kind and character; (ii) the Mortgagor owns and will own all of the Building Equipment, free and clear of all liens, charges and encumbrances (other than the Permitted Mortgages) of every kind and character; (iii) this Mortgage is and will remain a valid and enforceable lien on, and security interest in, the Mortgaged Premises; and (iv) the Mortgagor hereby warrants and will forever warrant and defend such title and the validity, enforceability and priority of the lien and security interest hereof against the claim of all persons and parties whomsoever.

SECTION 2.02.  Good Standing.  The Mortgagor is a limited liability company duly organized and existing in good standing under the laws of the State of New York, has the requisite power and authority, company and otherwise, to own property and to carry on its business as now being conducted and is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned by it therein or in which the transaction of its business makes such qualification necessary.

SECTION 2.03.  Agency.  The Mortgagor has full power and authority and legal right to enter into this Mortgage, to make the borrowing, to execute and deliver the Note and to incur the Obligations, all of which have been duly authorized by all proper and necessary company action.  No consent or approval of any public authority is required as a condition to the execution, delivery and performance, enforceability or validity of this Mortgage or the Note.

SECTION 2.04.  Binding Agreement.  This Mortgage constitutes, and the Note, when issued and delivered pursuant hereto for value received, will constitute, the valid and legally binding obligation of the Mortgagor enforceable against the Mortgagor in accordance with their respective terms except as such enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

SECTION 2.05.  Litigation.  There are no proceedings pending or threatened before any court or arbitration panel or before any governmental body which relates to the transactions contemplated by this Mortgage or which will materially adversely affect the financial condition or operations of the Mortgagor, except proceedings for which the Mortgagor is fully indemnified against loss.

SECTION 2.06.  No Legal Bar.  The execution, delivery and performance by the Mortgagor of this Mortgage and the Note herein do not and will not violate in any material way any provision of any existing law or regulation or any order, judgment, award or decree of any court, arbitrator or governmental instrumentality, or the articles of organization or operating agreement of the Mortgagor, or any existing mortgage, indenture, contract or agreement, affecting any of its respective properties and do not and will not result in the creation or imposition of any lien, charge or other encumbrance on any of the properties or assets of the Mortgagor pursuant to the provisions of any such mortgage, indenture, contract or agreement.

SECTION 2.07.  No Default.  The Mortgagor is not in default in the payment or performance of any of its obligations for borrowed money or for the deferred purchase price of property or services, and no Event of Default (as herein defined) nor any act, condition or event which with the giving of notice, the lapse of time or both would constitute an Event of Default, has occurred and is continuing hereunder.

SECTION 2.08.  Taxes.  The Mortgagor has filed, or caused to be filed, all federal, state and local tax returns which to the knowledge of the Mortgagor are required to be filed and has paid, or caused to be paid, all taxes shown on such returns.  No additional tax liability has been asserted against the Mortgagor or an assessment received which remains open and unpaid.

5

## ARTICLE III
## CERTAIN COVENANTS OF THE MORTGAGOR

The Mortgagor covenants and agrees that:

SECTION 3.01. Payment of Obligations. The Mortgagor will punctually pay the Obligations as provided in this Mortgage and the Note whenever the same shall become due and will punctually perform and observe all of its other covenants and agreements under all provisions of this Mortgage and the Note.

SECTION 3.02. Insurance. (a) The Mortgagor will keep the Improvements and the Building Equipment insured at all times for the benefit of the Mortgagee (i) against loss by fire, (ii) by means of an extended coverage endorsement, against loss or damage by windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicle and smoke, (iii) against war risks as, when and to the extent such insurance is obtainable from the United States of America or any agency thereof, (iv) against loss of rentals due to any of the foregoing causes, (v) against damage or loss by flood if the Mortgaged Premises or any part thereof are located in a Federally designated "special flood hazard area" , (vi) during the period of any construction, repair, restoration or replacement of the Improvements, a standard all-risk builder's risk policy with extended coverage, including coverage against collapse, written on a completed value basis, for an amount at least equal to the full insurable value of the Improvements and the Building Equipment and workmen's compensation, in statutory amounts, (vii) against damage or loss from (A) sprinkler system leakage and (B) boilers, boiler tanks, heating and air conditioning equipment, pressure vessels, auxiliary piping and similar apparatus, and (viii) when and to the extent required by the Mortgagee, against any other risk insured against by persons operating similar properties in the locality of the Mortgaged Premises.

(b)        The Mortgagor will reimburse the Mortgagee for any premiums paid for insurance obtained by the Mortgagee on the Mortgagor's default in obtaining or maintaining such insurance, or in assigning and delivering the policies as hereinafter provided, which amounts until reimbursed, together with interest thereon at the Default Rate shall become part of the Obligations and shall be secured by this Mortgage;

(c)        All insurance required under this Section shall be fully paid and non-assessable and the policies shall be in terms and amounts as shall be satisfactory to the Mortgagee from time to time and which shall be issued by insurers having a minimum policy holders rating of "A" per the latest rating publication of Property and Casualty Insurers by A.M. Best Company and who are lawfully doing business in New York and are otherwise acceptable in all respects to the Mortgagee. Without limiting the foregoing, each such policy shall have endorsed thereon, the New York Standard Mortgagee Clause, without contribution or co-insurance by the Mortgagee. In addition, each such policy shall provide that such policy may not be cancelled, amended or otherwise materially altered without ten (10) days' prior written notice to the Mortgagee.

(d)        As additional security for the Obligations, regardless of the types or amounts of insurance required and approved by the Mortgagee, the Mortgagor will assign and deliver to the Mortgagee all policies of insurance acquired by the Mortgagor to insure against any loss or damage to the Mortgaged Premises.

(e)        Notwithstanding the provisions of Subdivision 4 of Section 254 of the Real Property Law, the Mortgagee shall be entitled to retain and apply the proceeds of any policy of insurance, whether against fire or any other hazard, to the payment of the Obligations or, if the Mortgagee, in its sole discretion, shall so elect, the Mortgagee may hold all or any part of such proceeds for application to payment of the cost of restoration of the Mortgaged Premises upon such terms as the Mortgagee shall determine and require. In no event shall the Mortgagee be deemed a trustee with respect to any insurance proceeds paid to and held by the Mortgagee.

(f)        Not less than fifteen (15) days prior to the expiration date of each policy furnished by the Mortgagor pursuant to this Section, the Mortgagor will deliver to the Mortgagee a renewal policy or policies marked "premium paid" or accompanied by other evidence of payment satisfactory to the Mortgagee.

(g)        In the event of a foreclosure of this Mortgage or other transfer of title or assignment of the Mortgaged Premises in satisfaction of all or any part of the Obligations, all of the rights of the Mortgagor, including any rights to the proceeds of insurance and to the rebate of unearned premiums, in and to all policies of insurance then in force with respect to the Mortgaged Premises shall immediately vest in such purchaser or transferee.

SECTION 3.03. Impositions. (a) The Mortgagor will pay all Impositions now or hereafter levied against the Mortgaged Premises or any part thereof, and in default thereof, the Mortgagee may pay the same and the Mortgagor will repay the same with interest thereon at the Default Rate and the same shall become a part of the Obligations and be

6

secured by this Mortgage. Unless the Mortgagor is making monthly deposits with the Mortgagee pursuant to Section 3.04, upon request of the Mortgagee, the Mortgagor will exhibit to the Mortgagee receipts for the payment of all items specified in this Section prior to the date when the same shall become delinquent.

(b)      The Mortgagor will promptly pay and discharge all income, franchise, stamp, withholding and other taxes imposed from time to time upon its income or operations or in connection with any of the Obligations prior to the date on which penalties shall attach thereto.

(c)      Upon prior written notice to the Mortgagee, the Mortgagor shall have the right at its sole expense to contest the amount or validity, in whole or in part, of any Impositions, or to seek a reduction in the valuation of the Mortgaged Premises, or any part thereof, as assessed for real estate or personal property tax purposes, by appropriate proceedings diligently and promptly conducted in good faith.  The Mortgagor may commence such proceedings, however, only after payment of such Impositions, unless such payment would bar any such proceedings or interfere materially and adversely with the prosecution thereof, in which event the Mortgagor may postpone or defer payment of such Impositions if (i) the Mortgagor shall establish a reserve or other security with the Mortgagee in an amount and form satisfactory to the Mortgagee for application to the payment of such Imposition prior to the date when a judgment or order concluding such proceeding becomes final or to the date when any writ or order is issued under which the Mortgaged Premises or any part thereof may be sold and (ii) the Mortgagor shall, in writing, indemnify and hold harmless the Mortgagee from and against any loss, claim, damage or expense (including reasonable attorneys' fees) suffered or incurred by the Mortgagee arising out of such contest.

(d)      If any exemption, abatement, or reduction of any Impositions on the Mortgaged Premises is altered, modified, revoked, reduced, terminated or in any way disallowed or declared invalid, the Mortgagor shall, within five (5) days upon request of the Mortgagee in person or within fifteen (15) days upon request of the Mortgagee by mail, pay any Imposition imposed upon the Mortgaged Premises by reason of the loss or reduction of such abatement or exemption, together with any interest or penalty thereon.

(e)      The Mortgagor will pay or cause to be paid all PILOT payments which now or hereafter become due and owing by the Mortgagor to the Agency under the Agency Lease and that certain PILOT Agreement, dated as of June 1, 2016 and entered into by and between the Agency and the Mortgagor (with acknowledgment and guaranty of the Mortgagor, and collectively, the "PILOT Agreement" dated June 1, 2016.

**SECTION 3.04.  Escrow for Impositions and Insurance.**

(a)  At the option of the Mortgagee, as further collateral security for the obligations of the Mortgagor under Sections 3.02 and 3.03 (other than Section 3.03 (e)), but not in lieu thereof, the Mortgagor, at the option of the Mortgagee, will deposit with the Mortgagee each and every month (on the date when interest shall be due and payable under the Note) after such notice shall have been given and until payment in full of the Obligations, an amount equal to one twelfth (1/12) of the (i) annual Impositions; and (ii) one twelfth (1/12) of the annual premium for insurance required by the Mortgagee under Section 3.02.  The Mortgagor shall also deposit with the Mortgagee on demand, a sum which, when added to the foregoing monthly installments will be sufficient to permit the Mortgagee to pay each such Imposition, premium or payment not less than thirty (30) days before its due date.

(b)      In the event that at any time the funds deposited with the Mortgagee under this Section 3.04 are or shall be insufficient to pay any of the Impositions or insurance premiums whenever the same shall become due and payable, the Mortgagor shall pay to the Mortgagee upon demand, an amount equal to such deficiency.  All funds so deposited shall, until so applied, constitute additional security for the Obligations, may be held by the Mortgagee  without interest (except to the extent required under applicable law), may be commingled with other funds of the Mortgagee and, provided that no Event of Default shall have occurred and be continuing hereunder, shall be applied in payment of the Impositions prior to their becoming delinquent to the extent that the Mortgagee shall have such funds on hand; provided however, the Mortgagee shall have no obligation to use such funds to pay any installment of Impositions prior to the last day on which payment thereof may be made without penalty or interest or to pay an insurance premium prior to the due date thereof.  In no event shall the Mortgagee be deemed a trustee with respect to such deposited funds.  It shall be the Mortgagor's responsibility to furnish the Mortgagee with bills or invoices for the Impositions and insurance premiums in sufficient time to pay the same before any penalty or interest attaches and before any policies of insurance lapse, and the Mortgagee shall have no responsibility for payment of the same in the absence of such bills or invoices.  If an Event of Default shall have occurred and be continuing hereunder, or if the Obligations shall be accelerated as herein provided, all funds so deposited may, at the direction of the Mortgagee, be applied to the Obligations in the order determined by the Mortgagee, or to cure such Event of Default or as provided in this Section.

**SECTION 3.05. Alterations; Maintenance; Waste.** (a) The Mortgagor shall not remove, demolish or structurally or materially alter any of the Improvements (except for alterations or improvements costing less than $50,000.00) , nor shall any of the Building Equipment be removed without the prior written consent of the Mortgagee, which consent shall not be unreasonably withheld or delayed; provided, however, any worn-out or obsolete Building Equipment may be removed without the prior written consent of the Mortgagee if the same shall be promptly replaced by Building Equipment with a value not less than that of the Building Equipment removed and which shall be free of any liens superior to or in parity with the lien in such Building Equipment granted hereunder.

(b)     The Mortgagor shall operate and maintain the Mortgaged Premises at its own expense in good repair and operating condition and shall at its own expense perform all repairs, maintenance, replacements and improvements (whether structural or nonstructural, or interior or exterior) (including, without limitation, all work required to be performed by the Mortgagor under any Lease) and will not commit or permit to occur any waste of any part of the Mortgaged Premises or commit any acts which would otherwise impair the value or use of the Mortgaged Premises.

**SECTION 3.06. Compliance with Laws.** The Mortgagor will perform and comply promptly with, and cause the Mortgaged Premises to be maintained, used and operated in accordance with, any and all (i) present and future laws, ordinances, rules, regulations and requirements of every duly constituted governmental or quasi-governmental authority or agency applicable to the Mortgagor or the Mortgaged Premises, (ii) similarly applicable orders, rules and regulations of any regulatory, licensing, accrediting, insurance underwriting or rating organization or other body exercising similar functions, (iii) similarly applicable duties or obligations of any kind imposed by law, covenant, condition, agreement or easement, public or private, and (iv) policies of insurance at any time in force with respect to the Mortgaged Premises.

**SECTION 3.07. Condemnation.** (a) Immediately upon receipt of notice of the institution of any proceeding, threatened proceeding or negotiations for the taking of any interest or estate in the Mortgaged Premises or any part thereof, whether for permanent or temporary use and occupancy in condemnation or by the exercise of the power of eminent domain or by agreement of interested parties in lieu of such condemnation (each of the foregoing being referred to herein as a "Taking"), the Mortgagor shall promptly notify the Mortgagee and shall keep the Mortgagee currently advised, in detail, as to the status of such proceedings or negotiations and shall promptly provide the Mortgagee with copies of all notices, pleadings, judgments, determinations and other papers received or delivered by the Mortgagor therein. The Mortgagee shall have the right to appear and participate therein and may be represented by counsel of its choice. The Mortgagor agrees to cooperate with the Mortgagee in connection with such participation including, without limitation, the execution by the Mortgagor of such documents as the Mortgagee may request from time to time. The Mortgagor will not, without the Mortgagee's prior written consent, enter into any agreement for a Taking with anyone authorized to acquire the same by eminent domain or in condemnation.

(b)     In the event of any Taking, as further collateral security for the Obligations, the award or other compensation payable to the Mortgagor in connection with such Taking (the "Award") is hereby assigned and shall be paid to the Mortgagee. The Mortgagee shall have the right to apply any proceeds of any Award first to reimburse the Mortgagee for all costs and expenses, including attorneys' fees and disbursements, incurred in connection with the proceeding in question or the collection of such amounts and, second, the remainder thereof in the same manner as provided in Section 3.02(e) for insurance proceeds held by the Mortgagee (subject however to the provisions hereafter set forth in Section 3.07 (d). Alternatively, the Mortgagee, at its election, may hold the Award to be applied to restoration of the remainder of the Mortgaged Premises. If the Mortgagee elects to apply the Award to such restoration, or if the Mortgagee shall apply the Award to such restoration pursuant to the provisions hereafter set forth in Section 3.07 (d), whether or not the Award shall be sufficient for such purpose, the Mortgagor shall promptly commence and diligently continue to restore such remaining portion as nearly as possible to a complete and economically viable whole of the same character and condition as existed immediately prior to such Taking, and the Mortgagee shall apply the Award for the restoration in such amounts and at such times as, in the Mortgagee's judgment, are appropriate. The Mortgagee shall pay to such Person as may lawfully be entitled thereto, any amount of the Award remaining after application of the Award in accordance with this Section 3.07. Notwithstanding anything herein or at law or in equity to the contrary, none of the proceeds of any Award paid to the Mortgagee as herein provided shall be deemed trust funds and the Mortgagee shall be entitled to dispose of such proceeds as provided in this Section.

(c)     Notwithstanding any Taking causing injury to or a decrease in value of the Mortgaged Premises (including a change in the grade of any street), the Mortgagor shall continue to pay the Obligations as provided herein. Any reduction in the Obligations resulting from such application of the Award shall be deemed to take effect only on the date of such receipt by the Mortgagee of the Award and application against the Obligations; provided that, if prior to the receipt by the Mortgagee of the Award the Mortgaged Premises shall have been sold on foreclosure of this Mortgage or otherwise, the Mortgagee shall have the right to receive the same to the extent of any deficiency found to be due upon such sale, with interest thereon at the greater of the Default Rate or the legal rate of interest, whether or not a deficiency judgment on this

Mortgage shall have been sought, recovered or denied, together with attorneys' fees and disbursements incurred by the Mortgagee in connection with the collection thereof.

(d)    Anything contained in this Section 3.07 to the contrary notwithstanding and provided that no default shall then exist under this Mortgage beyond the expiration of any applicable notice and/or grace period specified herein within which to cure such default, if not more than fifteen (15%) percent of the Mortgaged Premises shall be taken by eminent domain and the Award therefor is received at least six (6) months prior to the Maturity Date and the Mortgagor notifies the Mortgagee in writing within ten (10) days of such taking by eminent domain that the Mortgagor elects to repair and restore the remainder of the Mortgaged Premises substantially to its value, condition and character immediately prior to such taking by eminent domain and, the Mortgagor shall be satisfied that upon the completion of the repair and restoration of the Mortgaged Property the principal balance of the Note will not be in excess of 75% of the appraised value of the portion of the Mortgaged Property remaining subject to the lien of this Mortgage, as determined by an appraisal satisfactory in all respects to the Mortgagee, then the Mortgagee shall deliver to the Mortgagor the award or payment from time to time as the work progresses for repair and restoration of the remainder of the Mortgaged Property, on such terms and subject to such conditions as the Mortgagee shall in its sole and absolute discretion determine, and the Mortgagor covenants and agrees with the Mortgagee, and hereby undertakes, to fund any and all deficiencies, so that at all times the funds held by the Mortgagee and remaining to be disbursed for purposes of repair and restoration shall be sufficient to complete the work. In all other respects the other provisions of this Section 3.07 shall continue to apply with full force and effect.

SECTION 3.08.    Transfers.    The Mortgagor expressly acknowledges that the continuous fee simple ownership of the Mortgaged Premises is of a material nature to the making of the Loan and to the acceptance of this Mortgage by the Mortgagee. Accordingly, the Mortgagor shall not directly or indirectly sell, convey, transfer or otherwise dispose of any interest or estate in the Mortgaged Premises or any part thereof, whether legal or beneficial, or permit a transfer to occur by operation of law, unless the Mortgagee shall have first given its consent thereto in writing. The consent of the Mortgagee to any particular transfer shall not constitute its consent to any further or future transfer.

SECTION 3.09.    Inspection; Management.    The Mortgagee and any persons authorized by the Mortgagee shall, during the hours of 9AM to 5PM upon reasonable notice to the Mortgagor, have the right to (i) examine and make copies of all books and records of the Mortgagor and all supporting data therefor, (ii) enter and inspect the Mortgaged Premises at all reasonable times and (iii) audit and inventory the Building Equipment. If at any time after default by the Mortgagor in the performance of any of the terms, covenants or provisions of this Mortgage or of the Note, the management or maintenance of the Mortgaged Premises shall be determined by the Mortgagee to be unsatisfactory, the Mortgagor shall employ, for the duration of such default, as managing agent of the Mortgaged Premises, such person or firm as from time to time shall be approved by the Mortgagee.

SECTION 3.10.    Maintenance of Books and Records.    The Mortgagor shall keep and maintain complete and accurate books of record and account in which complete entries will be made in a manner to enable the preparation of financial statements in accordance with GAAP consistently applied reflecting all financial transactions of the Mortgagor.

SECTION 3.11.    Rent Roll Requirement.    The Mortgagor shall furnish or cause to be furnished to the Mortgagee within ten (10) business days after written request, a current rent roll of the Mortgaged Premises showing the names of tenants, space occupied by each tenant, rent payable by each tenant (gross and per square foot), lease security, if any, lease or occupancy expiration dates, options for renewal, rental during renewal terms, cancellation provisions and other relevant information.

SECTION 3.12.    Security Agreement.    (a) To the extent that any portion of the property comprising the Mortgaged Premises (including, without limitation, Building Equipment and general intangibles) whether now owned or in existence or hereafter acquired or created shall be determined to be personal property rather than real property (all such portions of the Mortgaged Premises, whether now owned or in existence or hereafter acquired or created, together with all replacements thereof, additions and accessions thereto and proceeds thereof being referred to collectively as the "Collateral"), then this Mortgage constitutes and shall be deemed to be a "security agreement" and "financing statement" with respect to the Collateral within the meaning of Article 9 of the Code.

(b)    The Mortgagor agrees that from time to time, at its expense, it shall, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Mortgagee may request in order to perfect, maintain and protect the security interest granted or purported to be granted under this Section 3.12, or to enable the Mortgagee to exercise and enforce its rights and remedies with respect to the Collateral under this Section 3.12. The Mortgagor hereby authorizes the Mortgagee to file one or more financing and continuation statements and amendments thereto, relative to all or any part of the Collateral without the signature of the Mortgagor where permitted by law. The Mortgagor hereby irrevocably appoints the Mortgagee its attorney-in-fact to execute and file any such financing

9

or continuation statements or amendments thereto, in the name and on behalf of the Mortgagor to perfect, preserve and protect the security interest of the Mortgagee granted or purported to be granted in the Collateral under this Section 3.12.

(c)    Upon the occurrence and during the continuation of an Event of Default, (i) with respect to the Collateral, the Mortgagee may proceed under applicable provisions of Part 5 of Article 9 of the Code and shall have all of the rights of a secured party provided therein and (ii) with respect to the Mortgaged Premises, the Mortgagee may proceed under applicable provisions of Article VI of this Mortgage.  The Mortgagor agrees that the Mortgagee may sell all or any part of the Collateral in one or more parcels at public or private sale for cash, on credit or for future delivery and upon such other terms as the Mortgagee may deem commercially reasonable.  And the Mortgagor agrees that to the extent notice of sale shall be required by law, then seven (7) days' notice to the Mortgagor of the time and place of any public sale or the time after which any private sale is to be made shall constitute a reasonable notification.  The Mortgagee shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given.  The Mortgagee may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(d)    All cash proceeds received by the Mortgagee in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Mortgagee, be held by the Mortgagee as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Mortgagee pursuant to Section 7.07) in whole or in part by the Mortgagee against, all or any part of the Obligations in such order as the Mortgagee shall elect.  Any surplus of such cash or cash proceeds held by the Mortgagee and remaining after payment in full of all the Obligations shall be paid over to the Mortgagor or whomsoever may be lawfully entitled to receive such surplus.

SECTION 3.13.  Further Assurances.  The Mortgagor shall, at the request of the Mortgagee, (i) promptly correct any defect, error or omission which may be discovered in the contents of the Note or this Mortgage, or in the execution, acknowledgment or recordation thereof or hereof, (ii) promptly do, execute, acknowledge and deliver any and all such further acts, deeds, conveyances, mortgages, deeds of trust, assignments (including without limitation, assignments confirming the assignment of Leases and Rents under Article V of this Mortgage), estoppel certificates, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Mortgagee may require from time to time in order to effectuate the purposes of this Mortgage, to subject to the lien and security interest created hereby any of the Mortgagor's properties, rights or interest covered or now or hereafter intended to be covered hereby, to perfect and maintain such lien and security interest, and to convey, grant, assign, transfer and confirm unto the Mortgagee the rights granted or now or hereafter intended to be granted to the Mortgagee hereunder or under any other instrument executed in connection with this Mortgage or which the Mortgagor may be or become bound to convey, mortgage or assign to the Mortgagee in order to carry out the intention or facilitate the performance of the provisions of this Mortgage.

SECTION 3.14.  Preservation and Defense of Lien; Other Liens.  (a) The Mortgagor shall maintain this Mortgage as a valid mortgage lien upon the Mortgaged Premises, shall not permit the same to be diminished or impaired in any way and shall not at any time directly or indirectly create, allow to accrue or suffer to exist (other than the Permitted Mortgages) any voluntary or involuntary, lien, encumbrance or charge (whether statutory, contractual or constitutional) which would be prior to, on a parity with, or subordinate to, the lien of the Mortgage upon any part of the Mortgaged Premises.  If any such lien shall be imposed upon any part of the Mortgaged Premises, the Mortgagor shall promptly cause the same to be discharged of record, by bonding, payment or otherwise.  The Mortgagor shall exhibit to Mortgagee, upon request, all receipts or other satisfactory evidence of the payment of the Impositions, charges, claims, liens or any other item which may cause any such lien to be filed against the Mortgaged Premises.  Notwithstanding the foregoing, nothing herein contained shall require the Mortgagor to pay or cause to be paid any Imposition prior to the time the same becomes due or shall prevent the Mortgagor from contesting the validity of any such Imposition in accordance with the provisions of Section 3.03.

(b)    If the lien, security interest, validity or priority of this Mortgage, or of title or any of the rights of the Mortgagor, or the Mortgagee in or to the Mortgaged Premises or any part thereof, shall be endangered or questioned, or shall be attached directly or indirectly, or if any action or proceeding is instituted against the Mortgagor or the Mortgagee with respect thereto, the Mortgagor will promptly notify the Mortgagee thereof and will diligently endeavor to cure any defect which may be developed or claimed, and will take all necessary and proper steps for the defense of such action or proceeding, including the employment of counsel, the prosecution or defense of litigation and, subject to the Mortgagee's approval, the compromise, release or discharge of any and all adverse claims.  The Mortgagee, (whether or not named as a party to such actions or proceedings), is hereby authorized and empowered (but shall not be obligated) to take such additional steps as it may deem necessary or proper for the defense of any such action or proceeding or the protection of the lien, security interest, validity or priority of this Mortgage or of such title or rights, including the employment of counsel, the prosecution or defense of litigation, the compromise, release or discharge of such adverse claims, the purchase of any tax title and the removal of prior liens and security interests.  The Mortgagor shall, on demand, reimburse the Mortgagee for all expenses (including reasonable attorneys' fees and disbursements) incurred by it in connection with the foregoing matters, and the

10

party incurring such expenses shall be subrogated to all rights of the person receiving such payment. All such costs and expenses of the Mortgagee, until reimbursed by the Mortgagor, shall become part of the Obligations and shall be secured by this Mortgage.

SECTION 3.15. **Filing and Recording.** The Mortgagor will, at the request of the Mortgagee, promptly record and re-record, file and re-file and register and re-register this Mortgage, any financing or continuation statements and every other instruments in addition or supplemental to any thereof that shall be required by law in order to perfect and maintain the validity, effectiveness and priority of this Mortgage and the lien and security interest intended to be created hereby, or to subject after-acquired property of the Mortgagor or proceeds to such lien and security interest, in such manner and places and within such times as may be necessary to accomplish such purposes and to preserve and protect the rights and remedies of the Mortgagee. The Mortgagor will furnish to Mortgagee evidence satisfactory to it of every such, filing or registration.

SECTION 3.16. **Estoppel Certificate.** The Mortgagor, within ten (10) days upon request, will execute and deliver to the Mortgagee a written statement duly acknowledged certifying the principal amount due on this Mortgage, the accrued and unpaid interest thereon and whether any offsets or defenses exist against the Obligations.

## ARTICLE IV
## ENVIRONMENTAL COMPLIANCE

SECTION 4.01. **Special Representations.** The Mortgagor represents and warrants to the Mortgagee as follows:

(a)    To the knowledge of the Mortgagor, the Mortgaged Premises are not currently used, nor to the Mortgagor's knowledge, have they been used in the past, by the Mortgagor, prior owners, tenants or any other Persons in a manner which violates applicable Environmental Laws or which would give rise to liability for cleanup, remediation or removal of or for injury to person or property caused by any Release of Hazardous Substances, nor has any event (including, without limitation, any Release) occurred, nor does any condition exist on or affect, nor is there presently any threat of a Release affecting, any part of the Mortgaged Premises which might violate such laws or give rise to such liability. No Hazardous Substance is currently located in the Mortgaged Premises except for ordinary fluids and solvents commonly used in the maintenance, operation or cleaning of the Improvements and any equipment located in the Mortgaged Premises, all of which fluids and solvents are properly and safely stored.

(b)    The Mortgagor has not received any notice from any governmental agency with respect to any investigation, demand or request pursuant to or enforcing any Environmental Law or relating to any condition affecting the Mortgaged Premises or caused by the Mortgagor or any Person using, occupying or visiting the Mortgaged Premises which would cause any such investigation, notice, demand or request to be made by any such governmental agency, has no knowledge of any of the foregoing and has no knowledge of any such notice sent to prior owners of the Mortgaged Premises, tenants thereof or any other Persons.

(c)    Without limiting the generality of Section 2.05, there is no litigation or proceeding (whether judicial or administrative and whether civil or criminal) pending, or to the knowledge of the Mortgagor, threatened against, the Mortgagor, any existing or prior tenant, occupant or licensee of the Mortgaged Premises or any part thereof, any prior owner of any interest or estate therein, or any Person in any way related to, affiliated with, or controlled by the Mortgagor, such tenant, occupant or licensee or former owner which seeks to enjoin, remove or remediate or cause the removal or remediation of any Release or any threatened Release, or which seeks any other legal or equitable remedy for the violation of any Environmental Law, or for the injury (or threat thereof) to any Person, property, animal life or vegetation caused directly or indirectly by a Hazardous Substance, or which seeks the removal, remediation or destruction of any Hazardous Substance used, stored, manufactured, treated, handled, generated, processed at or transported from the Mortgaged Premises.

(d)    The Mortgagor and all tenants, occupants and licensees of the Mortgaged Premises are in compliance with all applicable Environmental Laws and have obtained all necessary Environmental Permits required thereunder for the use, occupancy and operation of, and the conduct of business on, the Mortgaged Premises.

SECTION 4.02. **Use of Mortgaged Premises.** (a) The Mortgagor agrees not to use or permit the use of the Mortgaged Premises in a manner, nor act or suffer any act to occur, which would violate any Environmental Law in effect from time to time or which would give rise to liability by the Mortgagor for cleanup remediation or removal of, or damages to person or property caused in any way directly or indirectly by, any Hazardous Substance, nor will the Mortgagor permit any conditions to exist with respect to the Mortgaged Premises which would violate such laws or give rise to such liability.

(b)    The Mortgagor agrees not to use or permit the use of the Mortgaged Premises in such manner

which, in the sole determination of the Mortgagee, would constitute a danger or potential threat of harm (including a Release) to the health or safety of human or animal life or to vegetation, nor will the Mortgagor permit conditions to exist with respect to the Mortgaged Premises which, in the sole determination of the Mortgagee, would create such a danger, or potential threat thereon including, without limiting the generality of the foregoing, the existence of asbestos on the Mortgaged Premises in any quantity, form or condition.

(c)    The Mortgagor agrees not to permit any federal, state or local environmental lien to be levied against the Mortgaged Premises, even if such lien is subordinate to the lien of this Mortgage.

(d)    Without limiting the generality of Section 3.02(a), the Mortgagor shall, at the request of the Mortgagee, procure and maintain in force such policies of environmental impairment liability or other policies of insurance against loss resulting from such environmentally related risks, in such amount and form and with such carriers as shall be acceptable to the Mortgagee from time to time, provided that such insurance can be obtained at premiums which are commercially reasonable. The Mortgagee shall benefit from the provisions of Section 3.02(b) with respect to this subsection (d).

(e)    The Mortgagor shall furnish to the Mortgagee without notice or demand, without charge to the Mortgagee and within five (5) days of its receipt thereof, a true and complete copy (together with all schedules and exhibits thereto) of any environmental audit or assessment respecting any part of the Mortgaged Premises or any use or occupancy thereof, delivered or made available to, or prepared at the request of or for the account or benefit of the Mortgagor.

SECTION 4.03. Governmental Notices. The Mortgagor will provide the Mortgagee with copies of any communications with or notices from any federal, state or local authorities pursuant or relating to (i) any Environmental Law, or (ii) Hazardous Substances either affecting the Mortgaged Premises, or as used or found thereon, or any act or failure to act by the Mortgagor, within five (5) days of the receipt or sending thereof.

SECTION 4.04. Compliance with Environmental Laws. Without limiting the generality of Section 3.06, the Mortgagor will comply, and will require and cause each tenant, occupant and licensee of the Mortgaged Premises to comply, with all applicable Environmental Laws including, without limitation, obtaining and remaining qualified under all Environmental Permits necessary for the use, occupancy, operation and conduct of business upon the Mortgaged Premises.

SECTION 4.05. Asbestos. (a) No asbestos shall exist on the Mortgaged Premises in any form, condition or quantity, unless the same shall have been disclosed to the Mortgagee prior to the closing of the Loan and its existence and condition shall be approved in writing by the Mortgagee. The Mortgagee shall have no liability to the Mortgagor or any tenant, occupant or licensee of the Mortgaged Premises as a result of its decision to permit or not to permit the existence of asbestos on the Mortgaged Premises.

(b)    The Mortgagor shall comply, and shall require and cause each tenant, occupant and licensee at the Mortgaged Premises to comply, at all times with the terms of any asbestos-monitoring plan prescribed by any environmental engineer or consultant selected or approved by the Mortgagee. Pre-existing non-friable asbestos (the existence of which has been disclosed to the Mortgagee and the continued existence of which has been approved by the Mortgagee) shall not be exposed to conditions under which there is a reasonable likelihood that the asbestos or its covering will deteriorate or become damaged or delaminated or any other conditions under which the asbestos could become friable.

SECTION 4.06. Audits. (a) The Mortgagee may conduct or cause to be conducted environmental audits, assessments and tests (the "Audits") of the Mortgaged Premises and abutting or nearby real property from time to time as it deems necessary in its sole discretion. Such audits shall be performed by environmental consultants and engineers selected or approved by the Mortgagee. The Mortgagor shall pay the cost of such Audits on demand. The results of such Audits shall be deemed to be the property of the Mortgagee and the Mortgagee shall owe no duty of confidentiality to the Mortgagor or any other Person with respect to the contents thereof. The Mortgagor hereby agrees that the Mortgagee shall not be responsible for the scope of detail, contents or accuracy of any such Audits, and neither the Mortgagor nor any other Person shall have any recourse to or claim against the Mortgagee for any act of omission or commission of such environmental consultant or engineer. The Mortgagor shall fully cooperate with the environmental consultant or engineer in its examination of and inspection of the Mortgaged Premises in performance of the Audit including, but not limited to, responding to questions posed by such consultant or engineer, providing such consultant or engineer with unlimited access at reasonable times to the Mortgaged Premises, the employees and agents of the Mortgagor and the books and records of the Mortgagor. The Mortgagor shall require and cause each tenant, occupant and licensee of the Mortgaged Premises similarly to cooperate with such consultant or engineer.

(b)    The Mortgagee may, from time to time at the expense of the Mortgagor, request and procure the

12

opinion of an attorney competent in environmental law whenever the Mortgagee considers such an opinion to be reasonably necessary respecting the environmental condition of the Mortgaged Premises, and the terms, conditions and sufficiency of, and compliance with and transferability of existing, requested or required Environmental Permits.

(c)    The Mortgagee may, from time to time, require a (i) certification by the Mortgagor and any tenant, occupant and licensee of the Mortgaged Premises that there has been no change in the environmental condition of the Mortgaged Premises and (ii) evidence of compliance by the Mortgagor and all tenants, occupants and licensees of the Mortgaged Premises with any asbestos-monitoring plan prescribed by environmental engineers or consultants selected by or approved by the Mortgagee which plan shall be approved by the Mortgagee.

SECTION 4.07.  <u>Remediation and Clean-up of Mortgaged Premises.</u>  (a) The Mortgagor shall take all remedial action required by any issuer of an Environmental Permit applied for or issued to the Mortgagor or otherwise required under any Environmental Law or proceeding commenced pursuant thereto, including but not limited to clean-up, containment, destruction and removal of any Hazardous Substance.

(b)    Should the Mortgagee, in its sole discretion, believe there to be a use of, or a condition (regardless of the person responsible for such use or condition) existing on, the Mortgaged Premises which would violate applicable Environmental Laws, or which would constitute a dangerous, unhealthy or noxious use thereof or condition thereon, or which would give rise to potential liability of the Mortgagor or the Mortgagee for cleanup, remediation or removal of, or for injury to person or property caused in any way by Hazardous Substances, the Mortgagee may, but shall not be obligated to, perform or cause to be performed any remedial action, including but not limited to removal and clean-up, which the Mortgagee in its sole discretion believes necessary under the circumstances. The Mortgagor shall reimburse the Mortgagee on demand for any such expenses incurred, regardless of whether the Mortgagor would have ultimately been responsible for such costs under applicable law. All such amounts, until reimbursed, together with interest thereon at the Default Rate shall be a part of the Obligations and shall be secured by this Mortgage.

SECTION 4.08.  <u>Indemnity.</u>  The Mortgagor shall fully indemnify, hold harmless and defend the Mortgagee against any third party claims arising under any Environmental Law or otherwise involving Hazardous Substances or similar claims involving the use or condition of the Mortgaged Premises, and shall also indemnify the Mortgagee with respect to any fines, penalty payments, reasonable attorney's fees, sums paid in connection with any judicial or administrative investigation or proceeding and similar expenditures without regard to whether the Mortgagor would have ultimately been responsible for such claims, fines, payments or fees. Any amounts which the Mortgagor must pay to the Mortgagee under this Section are payable upon demand and, if unpaid, shall bear interest thereon at the Default Rate and the same shall become part of the Obligations and shall be secured by this Mortgage. The indemnity provided in this Section shall survive payment in full of the Obligations and the cancellation or discharge of this Mortgage.

## ARTICLE V
## LEASES AND RENTS

SECTION 5.01.  <u>Assignment of Leases and Rents.</u>  (a) The Mortgagor hereby absolutely and unconditionally assigns to the Mortgagee, all Leases (other than the Company Lease, the Agency Lease), and the Rents (other than Rents derived from the Company Lease, the Agency Lease) and shall, upon demand, deliver to the Mortgagee an executed counterpart of each such Lease. This assignment is absolute in nature and not an assignment for additional security only. Nothing contained in the first sentence of this subsection (a) is intended nor shall it be construed to bind the Mortgagee to commence or continue the performance of any of the covenants, conditions or provisions contained in any such lease or other document or otherwise to impose any obligation on the Mortgagee (including, without limitation, any liability under the covenant of quiet enjoyment contained in any lease in the event that any tenant shall have been joined as a party defendant in any action to foreclose this Mortgage and shall have been barred and foreclosed thereby of all right, title and interest and equity of redemption in the Mortgaged Premises), except that the Mortgagee shall be accountable for money actually received pursuant to this assignment. The Mortgagor hereby further irrevocably grants to the Mortgagee the right (i) to enter upon and take possession of the Mortgaged Premises for the purpose of collecting the Rents, (ii) to dispossess by the usual summary proceedings any tenant defaulting in the payment thereof to the Mortgagee, (iii) to lease all or a portion of the Mortgaged Premises and (iv) to apply the Rents, on account of the Obligations after payment of all necessary charges and expenses.

(b)    This assignment and grant shall continue in effect until all of the Obligations have been paid in full, the execution of this Mortgage constituting and evidencing the irrevocable consent of the Mortgagor to the entry upon and taking possession of the Mortgaged Premises by the Mortgagee pursuant to such grant, whether foreclosure has been instituted or not and without applying for a receiver.

(c)    So long as there shall exist no Event of Default hereunder, and except as otherwise expressly provided herein, the Mortgagor shall have the right and license to collect current payments of Rents as the same shall

13

accrue. The Mortgagor agrees to hold the Rents in trust for the sole benefit of the Mortgagee and to use the same in payment of the Obligations, the Impositions and all insurance premiums payable in respect of the Mortgaged Premises and all other charges on or against the Mortgaged Premises.

(d)    Upon the occurrence of any Event of Default, the right and license set forth in subsection (c) of this Section may be revoked by the Mortgagee, and thereafter the Mortgagee shall have the right and authority to exercise any of the rights or remedies set forth in Article VI.  In addition, upon the occurrence of such an Event of Default, the Mortgagor shall promptly pay to the Mortgagee (i) all prepayments (if any) of Rent and security or other deposits previously paid to the Mortgagor pursuant to any Lease and (ii) all charges for services or facilities or for escalation which were paid pursuant to any such Lease to the extent allocable to any period from and after such Event of Default.

(e)    If the Mortgagor is not required to surrender possession of the Mortgaged Premises hereunder in the event of an Event of Default hereunder, the Mortgagor will pay monthly in advance to the Mortgagee, on its entry into possession pursuant hereto, or to any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of the Mortgaged Premises or of such part thereof as may be in the possession of the Mortgagor, and upon default in any such payment, the Mortgagor will vacate and surrender possession of the Mortgaged Premises or such part thereof, as the case may be, to the Mortgagee or to such receiver and, in default thereof, may be evicted by summary or any other available proceedings.

SECTION 5.02.  **Mortgagor's Duties and Powers as Lessor.**  (a) The Mortgagor shall observe and perform every term, provision and condition of each Lease on its part to be observed or performed within the time therefor specified therein. The Mortgagor shall diligently enforce the terms, provisions and conditions of each Lease to be observed or performed by the tenant(s) thereunder short of termination thereof.  The Mortgagor shall promptly furnish to the Mortgagee a copy each notice of default, termination or cancellation sent or received by the Mortgagor in respect of any Lease.

(b)    The Mortgagor shall not assign, pledge or hypothecate, or attempt to assign, pledge or hypothecate, any interest in any Lease or any portion of the Rents.

(c)    This Mortgage, insofar as it affects any Lease which is not primarily for the residential purposes of the owner of the leasehold estate and which, at the date hereof, has an unexpired term of not less than five (5) years, is made with reference to Section 291-f of the Real Property Law.

SECTION 5.03.  **Rent Collection & Subordination.**  The Mortgagor shall not collect or accept any payments of Rents for a period of more than one month in advance (except for the deposit by the tenant of one or more installments of Rent as security for the Lease). The Mortgagor shall not consent or agree to accept a subordination of any Lease to any other mortgage affecting any part of the Mortgaged Premises. In addition, the Mortgagor shall not, without the prior written consent of the Mortgagee, consent to the subletting of any portion of the demised premises, or any assignment by of any Lease, by any tenant thereof (unless such Lease shall permit such assignment or subletting without the Mortgagor's consent).

SECTION 5.04.  **Bankruptcy of Tenant; Rejection of Leases.**  (a) In furtherance of and not in limitation of the general Granting Clause hereof, the Mortgagor further assigns, transfers and sets over to the Mortgagee all of the Mortgagor's right, title and interest in and to all claims and rights to the payment of money at any time arising in connection with any rejection or breach of any of the Leases by any tenant thereunder or trustee of such tenant under Section 365 of the Bankruptcy Code including, without limitation, all rights to recover damages arising out of such breach or rejection, all rights to charges payable by such tenant or trustee in respect of the demised premises following the entry of an order for relief under the Bankruptcy Code in respect of such tenant and all Rent and other charges outstanding under such Lease as of the date of entry of such order for relief.

(b)    If the Mortgagor shall receive on account of any claim, demand, action, suit or proceeding, including without limitation, any claim, contested matter or adversary proceeding under the Bankruptcy Code, any sums referred to in the immediately preceding subsection (a), the Mortgagor shall promptly deposit such sums in a segregated account (the "Account") with the Mortgagee and which shall be designated on the records of the Mortgagee as collateral for the payment and performance of the Obligations. The Mortgagor hereby assigns, transfers and sets over to the Mortgagee, and grants to the Mortgagee a security interest in, all sums from time to time on deposit in the Account (including all interest accruing thereon) as further security for the payment and performance of the Obligations. The Mortgagor shall not withdraw any sums from or further encumber the Account without the Mortgagee's prior written consent so long as the Obligations shall remain outstanding; provided, however, that if there shall not have occurred and be continuing any Event of Default or event, which with the giving of notice or lapse of time, or both, would constitute an Event of Default, the Account shall be released to the Mortgagor free of the lien and security interest granted hereby on the date on which Mortgagor shall have entered into a new Lease of the premises theretofore subject to the breached or rejected Lease with a tenant and on terms and conditions satisfactory to Mortgagee.

14

(c)    Any proof of claim or similar document filed by the Mortgagee in connection with the breach or rejection of the Lease by the tenant thereunder or its trustee under Section 365 of the Bankruptcy Code shall, for the purpose of perfecting the Mortgagee's rights conferred in subsection (b) of this Section 5.04, be deemed to constitute a petition by the Mortgagee against the Mortgagor for sequestration of rents under the laws of the State of New York.

## ARTICLE VI
## EVENTS OF DEFAULT; REMEDIES

SECTION 6.01.  **Acceleration; Events of Default**. The Obligations shall become immediately due and payable, at the option of the Mortgagee, upon the occurrence of any of the following events of default ("**Events of Default**"):

(a)    If the Mortgagor shall fail to pay any installment of principal of, or interest on, the Note within five (5) days after the same shall become due; or

(b)    If the Mortgagor shall fail to pay any other Obligations required to be paid hereunder or under the Note within five (5) days after the same shall have become due and payable, or if the Mortgagor shall fail to comply with any covenant, agreement or condition contained in this Mortgage, the Note or any other Loan Document; or

(c)    If any material representation, warranty or statement contained herein, in any application for the Loan or in any writing delivered to the Mortgagee simultaneously with the execution and delivery of this Mortgage shall prove to be incorrect in any material respect when made; or

(d)    If the Mortgagor shall fail to pay any Imposition within twenty (20) days after the same first becomes due and payable, or if the Mortgagor fails to furnish the Mortgagee with validated receipts of payment of such Impositions pursuant to Section 3.03; or

(e)    If, after notice and demand, the Mortgagor shall fail either to assign and deliver the policies of insurance herein required under this Mortgage or to reimburse the Mortgagee for premiums paid on such insurance, as hereinabove provided; or

(f)    Subject to the provisions of Section 3.05 (a) herein, upon the actual or threatened waste, removal or demolition of any Improvements; or

(g)    If the Mortgagor shall assign all or any part of the Rents or any Lease to any Person without the prior written consent of the Mortgagee; or

(h)    If the Improvements shall not be maintained in reasonably good repair; or

(i)    If the Mortgagor shall fail to comply with any requirement or order or notice of violation of law or ordinance issued by any federal, state or local governmental authority or agency claiming jurisdiction over the Mortgaged Premises or any part thereof within three (3) months from the issuance thereof; or

(j)    If the Mortgagor shall fail to comply with any covenants, agreements or conditions contained in this Mortgage and, such failure shall continue unremedied for the period within which performance is required to be made by specific provision of this Mortgage, or, if no such period is so provided, for a period of twenty (20) days after written notice thereof shall have been given by the Mortgagee or, with respect to any such default which shall be of such nature that it cannot reasonably be cured or remedied within twenty (20) days, if the Mortgagor shall not, at its own expense, promptly commence and exercise due diligence and continuous effort to remedy the same; or

(k)    If the Mortgagor or any Guarantor (i) defaults in the making of any payment of principal, interest or premium when due (whether at stated maturity, required prepayment, by acceleration, on demand or otherwise) on any other Debt (excluding Debt evidenced by the Note but including other Debt owed to the Mortgagee) beyond any period of grace provided with respect thereto, or (ii) fails to perform or observe any term, covenant, or condition on its part to be performed or observed under any of the Loan Documents or any agreement or instrument, if the effect of such failure to perform or observe is to accelerate, or to permit the acceleration of, with the giving of notice if required, the maturity of such Debt (including other Debt owed to the Mortgagee); or any such Debt (including other Debt owed to the Mortgagee) shall be declared to be due and payable or be required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof; or

(l)    If the Mortgagor or any Guarantor shall generally not pay its debts as such debts come due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or

15

any proceeding shall be instituted by or against the Mortgagor or any Guarantor seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property and, if instituted against the Mortgagor or any Guarantor shall remain undismissed for a period of sixty (60) days; or the Mortgagor or any Guarantor shall take any action (corporate, partnership or otherwise) to authorize any of the actions set forth above in this subsection (l); or

(m)     If the Mortgagor or any Guarantor shall dissolve or terminate or discontinue its business, or abandon the Mortgaged Premises; or

(n)     If any warrant of attachment or attachments or any levy, execution or sequestration or similar writ shall be issued against any of the credits or property of the Mortgagor or any Guarantor (including without limitation, any of the Rents or any other part of the Mortgaged Premises) and such warrant of attachment or attachments, levy, execution, sequestration or similar writ shall continue unstayed for thirty (30) days on appeal, or otherwise, or unsatisfied for a like period; or

(o)     Upon the entry of one or more judgments exceeding in the aggregate $50,000 not covered by insurance against the Mortgagor, any Guarantor or jointly with any Person and such judgment shall continue unvacated, unstayed or unbonded, pending appeal or unsatisfied for a period of thirty (30) days; or

(p)     If, on application of the Mortgagee, two (2) or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the Improvements on the Mortgaged Premises; or

(q)     In the event of the passage of any law deducting from the value of real property for the purposes of taxation, any lien thereon, or changing in any way the taxation of mortgages or debts secured thereby for state or local purposes, or the manner of collecting such taxes and imposing a tax, either directly or indirectly, on this Mortgage or the Note; or

(r)     If any provision of this Mortgage or any other Loan Document shall at any time after its respective execution and delivery and for any reason (except by its respective terms) cease to be in full force and effect or the validity or enforceability thereof shall be contested by the Mortgagor or any signatory thereof, or the Mortgagor or any signatory of any Loan Document shall deny that it has any further liability or obligation under this Mortgage or any other Loan Document (as the case may be) except in accordance with the terms thereof; or

(s)     If, without the prior written consent of the Mortgagee, (i) any legal or beneficial interest or estate in the Mortgaged Premises or any part thereof shall be sold, conveyed, transferred or otherwise disposed of, or (ii) any lien is created or imposed upon the Mortgaged Premises except the Permitted Mortgages and as provided in subsection (u) below; or

(t)     If the Mortgagor shall default under the terms, conditions or provisions of any other mortgage consented to by the Mortgagee on the Mortgaged Premises; provided, however, that nothing in this subsection (t) shall be deemed to deprive the Mortgagee of its right to refuse to consent to any transaction referred to in subsection (s) of this Section 6.01; or

(u)     If a lien for the performance of work or supply of materials is filed against the Mortgaged Premises or any portion thereof which shall not be discharged or bonded within thirty (30) days from the filing thereof; or

(v)     If there shall occur a default or event of default under, or a failure to observe or perform any term, provision or condition contained in, any Loan Document, Company Lease, Agency Lease or PILOT Agreement on the part of any party required to so observe or perform which shall continue unremedied beyond any applicable grace period provided for therein; or

(w)     If any material adverse change shall occur in the financial condition, operations or business prospects of the Mortgagor or any Guarantor after the date hereof, as determined by the Mortgagee; or

(x)     If any claim of priority to the lien of this Mortgage based upon title, lien or otherwise, shall be upheld by any court of competent jurisdiction or shall be consented to by the Mortgagor; or

(y)     If the Mortgagor or any Guarantor shall make or permit to be made any material change in the character of its business as carried on at the date hereof; or

16

(z)    If the Mortgagor shall, without the Mortgagee's prior written approval, elect to treat any Lease as terminated under Section 365(h)(1) of the Bankruptcy Code (any such election made by the Mortgagor, as holder of the fee simple estate in the Mortgaged Premises, without the Mortgagee's prior written consent, in addition to constituting an Event of Default, being void); or

(aa)    If without the prior written consent of the Mortgagee, any proceedings are commenced or agreements entered into for any Taking; or

(bb)    If without the consent of the Mortgagee, any interest of any nature whatsoever in the Mortgagor or any Guarantor (whether partnership, stock, equity, beneficial, profit, loss or otherwise) is in any manner, by operation of law or otherwise, whether directly or indirectly, sold, transferred, assigned or conveyed, and irrespective of whether any such sale, transfer, assignment or conveyance is voluntary, by reason or operation of law or is otherwise made; or

(cc)    If Operating Company Corp. fails, at any time, to occupy at least 51% of the rentable square footage of the Mortgaged Premises for the conduct of its business; or

(dd)    Upon the death of Individual Guarantor.

SECTION 6.02.  **Remedies.**  Upon the occurrence of any such Event of Default, in addition to any other rights and remedies the Mortgagee may now or at any time have hereunder, under the Note or any other Loan Document or under any applicable law, the Mortgagee may personally, by its agents or its attorneys (subject, in the case of the Agency, to Section 7.26 hereof):

(a)    Institute one or more proceedings for the complete foreclosure of the Mortgage under any applicable law, or for the partial foreclosure of the Mortgage under any applicable law for the portion of the Obligations then due and payable, subject to the lien of this Mortgage continuing unimpaired and without loss of priority so as to secure the balance of the Obligations not then due and payable;

(b)    Institute an action, suit or proceeding in equity for the specific performance of any of the provisions contained herein;

(c)    Exercise in respect of any part or parts of the Collateral, all of the rights and remedies available to a secured party upon default under the applicable provisions of the Code;

(d)    Apply for the appointment of a receiver of the Mortgaged Premises as a matter of right, to be invested with the fullest powers permitted under applicable law, as a matter of right, without notice and without regard to or the necessity to disprove the adequacy of the security for the Obligations or the solvency of the Mortgagor or any other person liable for the payment of the Obligations, and the Mortgagor and each person liable for the payment of the Obligations, and the Mortgagor and each person liable for the payment of the Obligations waives or shall be deemed to have waived such necessity and consents or shall be deemed to have consented to such appointment;

(e)    Enter upon the Mortgaged Premises, and exclude the Mortgagor and its agents and servants wholly therefrom, without liability for trespass, damages or otherwise, and take possession of all books, records and accounts relating thereto, and the Mortgagor agrees to surrender possession of the Mortgaged Premises and of such books, records and accounts to the Mortgagee on demand after the happening of any Event of Default. The Mortgagee in having and holding the same may use, operate, manage and preserve the Mortgaged Premises and otherwise deal therewith either personally or by its superintendents, managers, agents, servants, attorneys or receivers, without interference from the Mortgagor. Upon each such entry and from time to time thereafter the Mortgagee may, at the expense of the Mortgagor, without interference by the Mortgagor and as it may deem advisable, (i) either by purchase, repair or construction, maintain and restore the Mortgaged Premises, (ii) insure or reinsure the same, (iii) make all necessary or proper repairs, renewals, replacements, alterations, additions, betterments and improvements thereto and thereon, (iv) complete the construction of the Improvements and, in the course of such completion, make such changes in the contemplated or completed Improvements as it may deem advisable, (v) in every such case in connection with the foregoing have the right to exercise all rights and powers of the Mortgagor with respect to the Mortgaged Premises, either in the Mortgagor's name or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants thereunder on such terms as it shall deem advisable;

(f)    With or without the entrance upon or taking possession of the Mortgaged Premises, collect and receive all Rents derived from the Mortgaged Premises, and after deducting therefrom all costs and expenses of every character incurred by the Mortgagee in collecting the same and in using, operating, managing, preserving and controlling the Mortgaged Premises, and otherwise in exercising the Mortgagee's rights under subsection (e) of this Section, including all

17

amounts necessary to pay Impositions, insurance premiums and other charges in connection with the Mortgaged Premises, as well as reasonable compensation for the services of the Mortgagee and its attorneys, agents and employees, apply the remainder as provided in Section 6.03;

(g)      Release any portion of the Mortgaged Premises for such consideration as the Mortgagee may require without, as to the remainder of the Mortgaged Premises, in any way impairing or affecting the lien or priority of this Mortgage, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the Obligations shall have been reduced by the actual monetary consideration, if any, received by the Mortgagee for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as the Mortgagee may require without being accountable for so doing to any other lienor;

(h)      To the extent permitted by law, choose to utilize the procedures set forth in Article 14 of the Real Property Actions and Proceedings Law and commence a non-judicial foreclosure by power of sale of this Mortgage. To the extent permitted by law, Mortgagor waives any right granted pursuant to Section 1421 or any other provision of the Real Property Actions and Proceedings Law to challenge Mortgagee's election to enforce this Mortgage by means of such non-judicial foreclosure by power of sale; and

(i)      Take any other action or pursue any other right or remedy, as the Mortgagee may have under applicable law, and the Mortgagor does hereby grant the same to the Mortgagee.

In the event that the Mortgagee shall exercise any of the rights or remedies set forth in subsections (e) and (f) of this Section 6.02, the Mortgagee shall not be deemed to have entered upon or taken possession of the Mortgaged Premises except upon the exercise of its option to do so, evidenced by its demand and overt act for such purpose, nor shall the Mortgagee be deemed a mortgagee in possession by reason of such entry or taking possession. The Mortgagee will not be liable to account for any action taken pursuant to any such exercise other than for Rents actually received by such party, nor liable for any loss sustained by the Mortgagor resulting from any failure to let the Mortgaged Premises, or from any other act or omission of the Mortgagee except to the extent such loss is caused by the willful misconduct or bad faith of such party. The Mortgagor hereby consents to, ratifies and confirms the exercise by the Mortgagee of such rights and remedies, and appoints the Mortgagee as its attorney-in-fact, which appointment shall be deemed to be coupled with an interest and is irrevocable, for such purposes.

If this Mortgage is foreclosed, the Mortgaged Premises, or any interest therein, may, at the discretion of the Mortgagee, be sold in one or more parcels or in several interests or portions and in any order or manner.

SECTION 6.03.  **Application of Proceeds**.  The purchase money, proceeds or avails of any sale or disposition referred to in Section 6.02, together with any other sums which may be held by the Mortgagee hereunder, whether under the provisions of this Article VI or otherwise, shall, except as herein expressly provided to the contrary, be applied as follows:

First:  To the payment of the costs and expenses of any such sale or disposition, including compensation to the Mortgagee, its agents and counsel, and of any judicial proceeding wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Mortgagee hereunder, together with interest thereon as provided herein, and all Impositions, except those Impositions subject to which the Mortgaged Premises shall have been sold;

Second:  To the payment in full of the Obligations (including principal, interest, premium and fees) in such order as the Mortgagee may elect;

Third:  To the payment of any other sums secured hereunder or required to be paid by the Mortgagor pursuant to any provision of this Mortgage, the Note or any Loan Document;

Fourth:  To the extent permitted by applicable law, to be set aside by the Mortgagee as adequate security in its judgment for the payment of sums which would have been paid by application under clauses First through Third above to the Mortgagee, arising out of an obligation or liability with respect to which Mortgagor has agreed to indemnify it, but which sums are not yet due and payable or liquidated.

SECTION 6.04.  **No Waiver; Mortgagee's Rights Absolute**.  No failure or delay on the part of the Mortgagee in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  The remedies provided for herein are intended to be cumulative and supplemental to the

18

rights and remedies available to the Mortgagee under applicable law.

All rights of the Mortgagee and the security interests and liens granted hereunder, and all Obligations shall be absolute and unconditional, and the priority of such security interests and liens shall remain unimpaired, irrespective of: (i) the death of any Mortgagor; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations or any other amendment or waiver of or any consent to any departure from any Guaranty, this Mortgage, or any other Loan Document; or (iii)  any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; (iv) any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Obligations; (v) any manner of application of collateral, or proceeds thereof, to all or any of the Obligations, or any manner of sale or other disposition of any collateral for all or any of the Obligations or any other assets of the Mortgagor; (vi) any change, restructuring or termination of the corporate structure or existence of the Mortgagor; or (vii) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Mortgagor.

SECTION 6.05. **Mortgagee's Option to Perform; Default Rate**. (a) The Mortgagor agrees that if it shall fail, after any applicable notice, grace or cure period, to pay any amount due under this Mortgage or to observe or perform any term, provision or condition of this Mortgage including, without limitation, its obligations to procure, maintain and pay the premiums on policies of insurance required under Section 3.02, then without limiting the effect of any other term, provision or condition of this Mortgage or any other Loan Document, and without waiving any such failure by the Mortgagor or any Event of Default, then the Mortgagee shall have the right but not the obligation, in its own name or in the name of the Mortgagor, to advance and pay all or any part of such amounts and to perform any or all such actions and, to effectuate such purpose, the Mortgagor hereby grants to the Mortgagee, in addition to any other rights and remedies hereunder, the right to enter upon and take possession of the Mortgaged Premises to such extent and as frequently as the Mortgagee may deem necessary or desirable to prevent or remedy such failure. All sums so advanced and expended by the Mortgagee in exercising its rights under this Section and all other sums, advances or expenses incurred by the Mortgagee under applicable law shall be immediately due from the Mortgagor, shall bear interest from the date paid or incurred until paid in full at the Default Rate, which sums together with such interest shall be deemed to be part of the Obligations and secured by this Mortgage.

(b)     In the event that the Mortgagee shall elect to perform and commence performance under this Section 6.05, nothing herein shall obligate the Mortgagee to continue, complete or resume such performance at any time.

(c)     If any of the Obligations cannot lawfully be secured by this Mortgage, or if any part of the Premises cannot lawfully be subject to the lien and security interest hereof, to the full extent of such Obligations, then all payments made thereon shall be applied first in discharge of that portion thereof which is unsecured by this Mortgage.

SECTION 6.06. **Waiver of Exemptions, Marshaling, Etc.**  The Mortgagor will not at any time insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Mortgaged Premises or any part thereof, wherever enacted, now or at any time hereafter in force, which may affect the covenants and terms of performance of this Mortgage, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Premises, or any part thereof, prior to any sale or sales thereof which may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; nor, after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof and the Mortgagor hereby expressly waives all benefit or advantage of any such law or laws and covenants not to hinder, delay or impede the execution of any power herein granted or delegated to the Mortgagee, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted.  The Mortgagor, for itself and all who may claim under it, waives, to the extent that it lawfully may, all right to have the Mortgaged Premises marshaled upon any foreclosure hereof.

SECTION 6.07. **Prepayment After Event of Default.**  If following the occurrence of an Event of Default and the acceleration of the maturity of the Obligations, the Mortgagor shall tender to the Mortgagee payment of an amount sufficient to pay the Obligations in full at any time prior to a sale of the Mortgaged Premises, then such tender shall be deemed to be a voluntary prepayment of the Note and the Mortgagor shall immediately pay to the Mortgagee the applicable prepayment premium or penalty specified herein or in the Note.

SECTION 6.08. **Refunds and Rebates**.  All refunds and rebates of Impositions are hereby assigned to the Mortgagee as further security for the payment of the Obligations.

19

## ARTICLE VII
## MISCELLANEOUS

**SECTION 7.01.** **Joint and Several Liability.** If the Mortgagor consists of more than one party, such parties shall be jointly and severally liable under any and all obligations, covenants and agreements of the Mortgagor contained herein. It is understood and agreed the Agency is not a "Mortgagor" under this Mortgage.

**SECTION 7.02.** **Construction; Cumulative Rights.** The provisions and covenants contained herein which are construed by Section 254 of the Real Property Law shall be construed as provided in that section, except as otherwise provided in Section 3.02 hereof; the additional provisions and covenants contained herein shall afford rights supplemental to, and not exclusive of, the rights conferred by the provisions and covenants construed by such Section 254 and shall not impair, modify, alter, limit or defeat such rights notwithstanding that such additional provisions and covenants may relate to the same subject matter or provide for different or additional rights in the same or similar contingencies as the provisions and covenants construed by Section 254. The rights of the Mortgagee arising under the provisions and covenants contained in this Mortgage shall be separate, distinct and cumulative and none of them shall be in exclusion of the others; and no act of the Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision, anything herein or otherwise to the contrary notwithstanding.

**SECTION 7.03.** **Subrogation.** To the extent that any of the Obligations are used to pay indebtedness secured by any other outstanding lien, security interest or charge against the Mortgaged Premises or to pay in whole or in part the purchase price therefor, the Mortgagee shall be subrogated to any and all rights, security interests and liens held by any owner or holder of the same, whether or not the same are released. The Mortgagor agrees that, in consideration of such payment by the Mortgagee, the Mortgagor hereby waives and releases all demands, defenses and causes of action for offsets and payments with respect to the same.

**SECTION 7.04.** **Legal Tender.** Any payment made in accordance with the terms of this Mortgage by any Person at any time liable for the payment of all or any part of the Obligations, or by any subsequent owner of the Mortgaged Premises, or by any other Person whose interest in the Mortgaged Premises might be prejudiced in the event of a failure to make such payment, or by any stockholder, officer or director of a corporation which at any time may be liable for such payment or may own or have such an interest in the Mortgaged Premises, shall be deemed, as between the Mortgagee and all Persons who at any time may be liable as aforesaid or may own the Mortgaged Premises, to have been made on behalf of all such Persons.

**SECTION 7.05.** **Lien Law Trust Fund.** The Mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement and will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

**SECTION 7.06.** **Right of Set-off.** Upon the occurrence and during the continuance of any Event of Default the Mortgagee is hereby authorized at any time and from time to time, without notice to the Mortgagor (any such notice being expressly waived by the Mortgagor), to set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Mortgagee to or for the credit or the account of the Mortgagor against any and all of the Obligations irrespective of whether or not the Obligations shall have made any demand under this Mortgage or the Note and although such Obligations may be unmatured. The Mortgagee agrees promptly to notify the Mortgagor after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Mortgagee under this paragraph are in addition to the other rights and remedies (including, without limitation, other rights of set-off) which the Mortgagee may have.

**SECTION 7.07.** **Fees and Expenses.** (a) The Mortgagor shall pay all fees, taxes and charges incurred in the procuring, making, recording, discharge, satisfaction, modification, assignment, administration and enforcement of the Note and this Mortgage, including, without limitation, the reasonable fees and disbursements of the Mortgagee's attorneys, charges for appraisals, fees and expenses relating to examination of title, title insurance premiums, surveys and mortgage recording, documentary, transfer or other similar taxes and revenue stamps (including, without limitation, any such revenue stamps or tax imposed by the United States of America, any state thereof or any governmental subdivision of such state, having jurisdiction, on the Note, or any other tax to be paid on or in connection therewith) at any time required to be paid by any governmental agency or authority, and in default thereof the Mortgagee may (but shall not be obligated to) pay the same and the Mortgagor will repay the same with interest thereon at the Default Rate and the same shall be added to the Obligations and be secured by this Mortgage.

20

(b)       The Mortgagor shall pay on demand all costs and expenses of the Mortgagee (including the reasonable fees and disbursements of its counsel) incurred by the Mortgagee in enforcing any of its rights or exercising any of its remedies hereunder, under the Note, this Mortgage and under any other Loan Document to which the Mortgagor is a party (including without limitation in connection with the foreclosure of this Mortgage). In addition, if any action or proceeding is commenced in which the Mortgagee becomes a party or participates, by reason of being the holder of this Mortgage or the Obligations, all sums paid by the Mortgagee for the expense of so becoming a party or participant (including reasonable counsel fees and disbursements) shall be paid by the Mortgagor on demand. All such sums payable by the Mortgagor hereunder, together with interest thereon at the Default Rate from the date when due until paid in full, shall be deemed a part of the Obligations and be secured by this Mortgage, prior to any right or title to, interest in, or claim upon the Mortgaged Premises subordinate to the lien of this Mortgage. In any action or proceeding to foreclose this Mortgage, or to recover or collect any of the Obligations, the provisions of law respecting the recovery of costs, disbursements and allowances shall apply in addition to the foregoing.

SECTION 7.08.   **Notices and Communications.**  All notices and other communications provided for hereunder shall be in writing and shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to each party at the address set forth in the beginning of this instrument or at such other address as shall be designated by such party in a written notice to the other party.

SECTION 7.09. **Late Charge.**  If any portion of the Obligations is not paid when due, the Mortgagor shall pay to the Mortgagee on demand a late payment charge of four ($.04) cents for each one ($1) dollar of each installment of principal and/or interest payable under the Note more than fifteen (15) days in arrears from its due date, in order to compensate the Mortgagee for covering the additional expenses involved in handling and processing such delinquent payments, which late payment charge shall be added to and become a part of the Obligations and be secured by this Mortgage. The imposition on, or payment by, the Mortgagor of this late payment charge, is not intended to and shall not create any period of grace for the payment of principal or interest unless such grace period is expressly set forth in the Note or this Mortgage.

SECTION 7.10. **Severability.**  If any provision of this Mortgage or the Note shall for any reason be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provision hereof or thereof, but this Mortgage shall be construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein or therein.

SECTION 7.11.   **Amendments and Waivers.**  No cancellation or discharge of this Mortgage, no amendment or waiver of any provision of this Mortgage, nor consent to any departure by the Mortgagor therefrom, nor any cancellation or discharge of this Mortgage, shall in any event be effective unless the same shall be in writing and signed by the Mortgagee, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 7.12. **Headings.**  The Section headings herein are for convenience only and shall not define, limit or enlarge the meaning of any provision of this Mortgage.

SECTION 7.13. **Entire Agreement**. This Mortgage with all schedules and exhibits hereto embodies the entire agreement and understanding between the parties hereto respecting the subject matter hereof.

SECTION 7.14. **Waiver of Jury Trial**. **The Mortgagor and the Mortgagee hereby irrevocably waive all right to trial by jury in any action, proceeding, claim or counterclaim arising out of this Mortgage, the Note or the Obligations.**

SECTION 7.15.   **Payments; Charges to Account**. All amounts referred to in this Mortgage shall be deemed to be in lawful money of the United States and all payments of all or any part of the Obligations shall be made to the Mortgagee in lawful money of the United States in same day funds at the address of the Mortgagee specified in Section 7.08. At the Mortgagee's election, the Mortgagor shall maintain at all times a deposit account (the "**Account**") with the Mortgagee which shall have a balance in immediately available funds on the dates on which principal and interest are due sufficient to pay installments due under the Note, and the Mortgagee is authorized (but shall not be obligated) to debit the Account for payment of installments of principal and interest due and owing.

**SECTION 7.16.** <u>USA Patriot Act</u> . The Mortgagee hereby notifies the Mortgagor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies the Mortgagor, which information includes the name and address of the Mortgagor and other information that will allow the Mortgagee to identify the Mortgagor in accordance with the Act. The Mortgagor will not: (a) be or become subject at any time to any law, regulation or list of any government agency (including, without limitation, the US Office of Foreign Asset Control List) that prohibits or limits the Mortgagee from making any advance or extension of credit to the Mortgagor or from otherwise conducting business with the Mortgagor, or (b) fail to provide documentary and other evidence of the Mortgagor's identity as may be requested by the Mortgagee at any time to enable the Mortgagee to verify the Mortgagor's identity or to comply with any applicable law or regulation, including, without limitation, Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318.

**SECTION 7.17.** <u>Covenants to Run with Land</u>. The covenants contained in this Mortgage shall run with the land and bind the Mortgagor, its successors and assigns of the Mortgagor and all subsequent encumbrancers, tenants and subtenants of the Mortgaged Premises and shall inure to the benefit of the Mortgagee and the successors and assignees of the Mortgagee.

**SECTION 7.18.** <u>Disclosures</u>. In addition to any other rights available to the Mortgagee, the Mortgagee may disclose to, and exchange and discuss with, any other Person (the Mortgagee and each such other Person being hereby irrevocably authorized to do so) any information concerning the Mortgagor (whether received by the Mortgagee or such Person in connection with or pursuant to this Mortgage or otherwise) for the purpose of protecting, preserving exercising or enforcing any rights hereunder or under the Note, or consulting with respect to any such rights or any rights of the Mortgagor, and the Mortgagee may disclose any such information as may be required by applicable law or in accordance with normal banking procedures.

**SECTION 7.19.** <u>Independent Counsel</u>. Each party represents and acknowledges that it has been represented by separate counsel in the negotiation, drafting and execution of this Mortgage. Each party respectively represents and acknowledges that the terms of each of the Note and this Mortgage have been explained to it by its separate and independent counsel, that it understands the terms of this Mortgage, and that this Mortgage and the Note is each executed and delivered knowingly and voluntarily and without any duress or coercion whatsoever. All parties to this Mortgage, and their counsel, have participated in the negotiation and drafting of this Mortgage such that the parties agree that no party will be considered the draftsman of this Mortgage for the purpose of any rule of contract construction which would resolve ambiguities in this Mortgage, if any, in favor of one party as against the other.

**SECTION 7.20** <u>Maximum Amount of Mortgage</u>. Notwithstanding anything to the contrary contained in this Mortgage, the maximum amount of the principal indebtedness secured by this Mortgage at execution or which under any contingency may become secured by this Mortgage is the amount set forth in the Preliminary Statement plus interest and all amounts expended by the Mortgagee pursuant to this Mortgage.

**SECTION 7.21** <u>Relationship</u>. The relationship of the Mortgagee to the Mortgagor hereunder is strictly and solely that of lender and borrower and mortgagor and mortgagee and nothing contained in the Note, this Mortgage, or any other Loan Document is intended to create, or shall in any event or under any circumstance be construed as creating, a partnership, joint venture, tenancy-in-common, joint tenancy or other relationship of any nature whatsoever between the Mortgagee and the Mortgagor other than as lender and borrower.

**SECTION 7.22** <u>Broker's Commissions</u>. The Mortgagor covenants and agrees that no brokerage commission or other fee, or compensation is to be paid by the Mortgagee on account of the Loan or other Obligations secured by this Mortgage and the Mortgagor agrees to indemnify and hold the Mortgagee and the Agency harmless against any claims for any such commission, fee or compensation.

**SECTION 7.23** <u>Reasonableness</u>. If at any time the Mortgagor believes that the Mortgagee has not acted reasonably in granting or withholding any approval or consent under this Mortgage or any other Loan Document as to which approval or consent either (i) the Mortgagee has expressly agreed to act reasonably, or (ii) absent such agreement, applicable law would nonetheless require the Mortgagee to act reasonably, then the Mortgagor's exclusive remedy shall be to seek injunctive relief or specific performance, and the Mortgagor shall not in such instance have any right to commence or maintain any action or proceeding against the Mortgagee seeking monetary or punitive damages.

**SECTION 7.24** <u>Offsets, Counterclaims and Defenses</u>. Any assignee of this Mortgage and the Note shall take the same free and clear of all offsets, counterclaims or defenses of any nature whatsoever which the Mortgagor may have against any assignor of this Mortgage and the Note, and no such offset, counterclaim or defense shall be interposed or asserted by the Mortgagor in any action or proceeding brought by any such assignee upon this Mortgage or the

22

Note and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by the Mortgagor to the extent permitted by applicable law.

**SECTION 7.25  Agency Leases.** The Mortgagor shall: (i) pay all sums required to be paid by the Mortgagor under and pursuant to the provisions of the Company Lease, the Agency Lease and the PILOT Agreement, (ii) diligently perform and observe all of the terms, covenants and conditions of the Agency Lease on the part of the Mortgagor to be performed and observed, unless such performance or observance shall be waived or not required in writing by the Agency, (iii) promptly notify the Mortgagee in writing of any default by the Mortgagor and/or Operating Company or the Agency under the Agency Lease in the performance or observance of any of the terms, covenants or conditions on the part of, respectively, the Mortgagor and/or Operating Company or the Agency to be performed or observed under the Agency Lease, (iv) promptly notify the Mortgagee of the giving of any notice by the Agency under the Agency Lease and/or the PILOT Agreement to the Mortgagor and/or Operating Company (other than notices customarily sent on a regular basis) and of any notice noting or claiming any default by the Mortgagor and/or Operating Company in the performance or observance of any of the terms, covenants or conditions of the Company Lease, the Agency Lease on the part of the Mortgagor and/or Operating Company to be performed or observed and deliver to the Mortgagee a true copy of each such notice, (v) promptly notify the Mortgagee in writing of any request made by any party to the Company Lease, the Agency Lease for arbitration proceedings pursuant to the Company Lease, the Agency Lease and/or the PILOT Agreement and of the institution of any arbitration proceedings, as well as of all proceedings thereunder, and promptly deliver to the Mortgagee a copy of the determination of the arbitrators in each such arbitration proceeding, (vi) furnish to the Mortgagee, within ten (10) days after demand, proof of payment of all items which are required to be paid by the Mortgagor and/or Operating Company pursuant to the Company Lease, the Agency Lease and/or the PILOT Agreement, and (vii) not subordinate or consent to the subordination of the Company Lease, the Agency Lease and/or the PILOT Agreement to any mortgage of the fee interest of the Mortgagor in the Mortgaged Property or the interest of the Agency under the Agency Lease, except such as agreed to by the Mortgagee.

**SECTION 7.26.  Agency's Liability.** Notwithstanding anything to the contrary in this Mortgage, with respect to the Agency, it is agreed that the Agency, its officers, members, employees, agents and directors shall have no personal liability hereunder, nor in their capacity as officers, members, employees, agents and directors. The Agency has executed this Mortgage to subject its interest in the Mortgaged Premises to the lien of this Mortgage; however, the Mortgagee shall have no recourse against or to the Agency but shall have recourse against the Mortgaged Premises. No provision, covenant or agreement contained in this Mortgage or any obligations herein imposed upon the Agency or the breach thereof, shall constitute or give rise to or impose upon the Agency a pecuniary liability or a charge upon its general credit. In making the agreements, provisions and covenants set forth in this Mortgage, the Agency has not obligated itself except in respect to its interest in the Mortgaged Premises. All covenants, stipulations, promises, agreements and obligations of the Agency contained herein shall be deemed to be covenants, stipulations, promises, agreements and obligations of the Agency and not of any member, director, officer, employee or agent of the Agency in his/her individual capacity, and no recourse shall be had for the payment of any of the Obligations or the principal of any debt or interest thereon or for any claim based thereon or hereunder against any member, director, officer, employee or agent of the Agency or any natural person executing this Mortgage.  No covenant herein contained shall be deemed to constitute a debt of the State of New York or Rensselaer County and neither the State of New York nor Rensselaer County shall be liable on any covenant contained herein, nor shall the Debt (secured by this Mortgage) be payable out of any funds of the Agency.

Notwithstanding any other term or condition contained in this Mortgage:

(a)    This Mortgage is executed by the Agency solely for the purpose of subjecting its interest in the real property and premises to the lien of this Mortgage and for no other purpose. All representations, covenants, and warranties of the Mortgagor herein are hereby deemed to have been made by the Mortgagor, the Borrower, the Company or the Debtor, and not by the Agency. The parties hereby expressly agree that the terms "Mortgagor", "Borrower", "Company", "Guarantor" and "Debtor" as such terms may be used in this Mortgage, shall not be defined to include the Agency.

(b)    The obligations and agreements of the Agency contained herein and any other instrument or documents executed in connection herewith or therewith, and any other instrument or document supplemental thereto or hereto, shall be deemed the obligations and agreements of the Agency, and not of any member, officer, agent (other than the Mortgagor) or employee of the Agency in his individual capacity, and the members, officers, agents (other than the Mortgagor) and employees of the Agency, shall not be liable personally hereon or thereon or be subject to any personal liability or accountability based upon or in respect hereof or thereof or of any transaction contemplated hereby or thereby.

(c)    The obligations and agreements of the Agency contained herein and therein shall not constitute or give rise to an obligation of the State of New York or Rensselaer County, New York, and neither the State of New York nor Rensselaer County, New York, shall be liable hereon or thereon, and, further, such obligations and agreements shall not

23

constitute or give rise to a general obligation of the Agency, but rather shall constitute limited obligations of the Agency payable solely from the revenues of the Agency derived and to be derived from the lease, sale or other disposition of the Project Facility, as such term is defined in the lease agreement dated as of June 1, 2016 (the "Lease Agreement") by and between the Mortgagor and the Agency (except for revenues derived by the Agency with respect to the Unassigned Rights, as such term is defined in the Lease Agreement).

(d)      No order or decree of specific performance with respect to any of the obligations of the Agency hereunder shall be sought or enforced against the Agency unless (i) the party seeking such order or decree shall first have requested the Agency in writing to take the action sought in such order or decree of specific performance, and ten (10) days shall have elapsed from the date of receipt of such request, and the Agency shall have refused to comply with such request (or, if compliance therewith would reasonably be expected to take longer than ten days, shall have failed to institute and diligently pursue action to cause compliance with such request within such ten day period) or failed to respond within such notice period, (ii) if the Agency refuses to comply with such request and the Agency's refusal to comply is based on its reasonable expectation that it will incur fees and expenses, the party seeking such order or decree shall have placed in an account with the Agency an amount of undertaking sufficient to cover such reasonable fees and expenses and (iii) if the Agency refuses to comply with such request and the Agency's refusal to comply is based on its reasonable expectation that it or any of its members, officers, agents (other than the Mortgagor) or employees shall be subject to potential liability, the party seeking such order or decree shall (A) agree to indemnify, defend and hold harmless the Agency and its members, officers, agents (other than the Mortgagor) and employees against any liability incurred as a result of its compliance with such demand, and (B) if requested by the Agency, furnish to the Agency satisfactory security to protect the Agency and its members, officers, agents (other than the Mortgagor) and employees against all liability expected to be incurred as a result of compliance with such request.

(e)      The Agency will record or cause this Mortgage to be recorded in all offices where recordation hereof is necessary and will pay, or cause to be paid, all documentary stamp taxes, if any, which may be imposed by the United States of America or any agency thereof or by the State of New York or other governmental authority upon this Mortgage.

(f)      Notwithstanding anything to the contrary stated in this document, the Agency specifically intends to except, and hereby excepts, from any and all property which the Agency agrees to mortgage, pledge, assign, grant a lien on, or otherwise convey pursuant to this document the "Unassigned Rights" as such term is defined in the Lease Agreement.

(g)      By acceptance of this Mortgage, the Mortgagee acknowledges and agrees it has no rights in the Lease Agreement, the rights enjoyed by the Mortgagor under said Lease Agreement, are not, and may not, be assigned to the Mortgagee, and that, upon foreclosure of this Mortgage, the Mortgagee will not succeed to the rights of the Mortgagor under said Lease Agreement.

SECTION 7.27.  **Agency is Executing at Mortgagor's Direction.** The Agency is executing this Mortgage at the direction of the Mortgagor. The Mortgagor hereby directs the Agency to execute and deliver this Mortgage to the Mortgagee and further agrees to indemnify the Agency (and its members, officers, directors, agents, servants and employees) in connection with the execution, delivery, recording, performing and enforcing of this Mortgage.

SECTION 7.28.  **Conflict with IDA Lease or IDA Sublease.** The Mortgagee shall not be deemed to have consented to or acquiesced in any particular provision of the Company Lease or the Agency Lease and the Agency and the Mortgagor hereby confirm that the liens of the Company Lease, the Agency Lease are in all respects subject and subordinate to this Mortgage. Nothing in the Company Lease or the Agency Lease shall vitiate in any way the Mortgagor's obligations under this Mortgage nor shall any provision hereof vitiate in any way the Mortgagor's obligations to the Agency under the Agency Leases.

SECTION 7.29.  **Joinder.** The Agency is a corporate governmental Agency constituting a body corporate and politic and a public benefit corporation of the State of New York, duly organized and existing under the laws of the State of New York. The Agency is executing this Mortgage in order to mortgage and grant a security interest to the Mortgagee in all of the Agency's right, title and interest in and to the Mortgaged Premises.

SECTION 7.30.  **Representations and Warranties of the Agency.** The Agency represents and warrants that it has power to enter into and perform this Mortgage, to create, pledge and grant the mortgage, pledge, and security interest in the Mortgaged Property to the extent of the Agency's interest therein, as provided in the Mortgage and to own its property and assets, has duly authorized the execution and delivery of this Mortgage by proper corporate action and neither this Mortgage, the authorization, execution, delivery and performance hereof by the Agency, the performance by the Agency of the agreements herein contained nor the consummation by the Agency of the transactions herein contemplated will violate

any provision of law applicable to the Agency, any order of any court or Agency of government applicable to the Agency, or any agreement, indenture or other instrument to which the Agency is a party or by which it or any of its property is subject to or bound, or be in conflict with or result in a breach of or constitute (with due notice and/or lapse of time) a default under any indenture, agreement or other instrument to which the Agency is a party or any provision of its by-laws or any other requirement of law. The Agency further represents and warrants that this Mortgage constitutes the legal, valid and binding obligation of the Agency enforceable against the Agency in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights generally and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

SECTION 7.31. <u>Termination of Lease</u>. Upon the termination of the Company Lease, the Agency Leases for any reason whatsoever and at the sole cost and expense of the Mortgagor, the Mortgagee shall prepare and deliver to the Agency and the Mortgagor, and the Agency and the Mortgagor shall execute, any documents necessary to amend and restate the Mortgage, in order to remove the Agency as a party hereto.

SECTION 7.32. <u>Non-Residential Improvements.</u> This Mortgage does not encumber real property principally improved or to be improved by one or more structures containing in the aggregate not more than six residential dwelling units each having its own separate cooking facilities.

IN WITNESS WHEREOF, the Mortgagor and the Agency have executed and delivered this Mortgage by their duly authorized representatives as of the day and year first above written.

COMPANY:                          PCC CASTLETON CORPORATION

                                  By: _____
                                  Daniel Ratner, Officer


AGENCY:                           RENSSELAER COUNTY
                                  INDUSTRIAL DEVELOPMENT AGENCY

                                  BY: _____
                                      (Vice) Chairman



STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF ALBANY         )

On the 27 day of October, in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared DANIEL RATNER, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                  Leesa Naimo-Fredette
                                  Notary Public - State of NY
                                  Registered in Saratoga County       Notary Public
                                  Registration No. 02NA6061310
STATE OF NEW YORK        )        Commission Expires: 07/16/20 1
                         ) ss.:
COUNTY OF _____     )

On the _____ day of _____, in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                  _____
                                  Notary Public

**IN WITNESS WHEREOF**, the Mortgagor and the Agency have executed and delivered this Mortgage by their duly authorized representatives as of the day and year first above written.

**COMPANY:**                                     **PCC CASTLETON CORPORATION**

                                                 By: _____
                                                 Daniel Ratner, Officer

**AGENCY:**                                      **RENSSELAER COUNTY
                                                 INDUSTRIAL DEVELOPMENT AGENCY**

                                                 BY: _____
                                                          (Vice) Chairman

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF ALBANY           )

On the ____ day of October, in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared **DANIEL RATNER**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Leesa Naimo-Fredette
Notary Public - State of NY
Registered in Saratoga County
Registration No. 02NA6061310                    _____
Commission Expires: 07/16/20 __                           Notary Public

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF _____        )

On the _____ day of _____, in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                                 _____
                                                          Notary Public

**IN WITNESS WHEREOF,** the Mortgagor and the Agency have executed and delivered this Mortgage by their duly authorized representatives as of the day and year first above written.

COMPANY:                          **PCC CASTLETON CORPORATION**

                                  By: _____
                                  Daniel Ratner, Officer

AGENCY:                           **RENSSELAER COUNTY
                                  INDUSTRIAL DEVELOPMENT AGENCY**

                                  BY: _____
                                       (Vice) Chairman

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF ALBANY         )

On the _____ day of October, in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared **DANIEL RATNER**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                  _____
                                            Notary Public

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF RENSSELAER     )

On the 14th day of November, in the year 2017, before me, the undersigned, a Notary Public in and for said State, personally appeared **JOHN H. CLINTON, JR.**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                  _____
                                            Notary Public

                                  Pamella Weisberg
                                  Notary Public, State of New York
                                  Qualified in Rensselaer County
                                  No. 01WE4943734
                                  Commission Expires October 31, 2018

**SCHEDULE A**

**Description of Mortgaged Premises**

American Land Title Association

ALTA Commitment Form
Adopted 6-17-06

Commitment No.: 1706028R

## EXHIBIT A
## PROPERTY DESCRIPTION

The land referred to in this Commitment is described as follows:

### Parcel 1

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, with the buildings and improvements thereon erected, situate, lying and being in the Town of Schodack, Rensselaer County, New York described as follows:

Beginning at a point at the northeast corner of Parcel No. 1 of lands formerly under waters of the Hudson River granted by The People of the State of New York to Ingalls & Co., Inc., by Letters Patent dated November 9, 1927 and recorded in Rensselaer County Clerk's Office December 7, 1927 in Book 451 of Deeds at page 128, said point being North 83° 54' 20" West 134.66 feet from center line monument No. 713 of the New York Central Railroad; thence along other lands of Anti-Corrosive Metal Products Co., Inc. South 12° 50' 55 West 170.03 feet to a point,
South 09° 34' 40" West 230.4 feet to a point, and
South 12° 50' 05" West 247.45 feet to an iron pin in the west line of the Con-Rail right-of-way (formerly New York Central Railroad), said pin being 80± feet west of the center line of said railroad right-of-way, thence along the west side of said right-of-way a chord distance of South 20° 19' 45" West 169.96 feet to a point; thence along other lands of Anti-Corrosive Metal Products Co., Inc. being conveyed simultaneously to Village of Castleton-on-Hudson
North 06° 16' 20" East 37.70 feet to a pin, and
North 64° 22' 00" West 798.91 feet to a pin at the east side of the Hudson River; thence along the east side of the Hudson River along the U.S. Pier and Bulkhead Line North 06° 19' 20" East 155.58 feet to a pin; thence along other lands of Anti-Corrosive Metal Products Co,. Inc. South 46° 45' 48" East 82.81 feet,
North 27° 27' 55 " East 246.98 feet,
North 17° 28' 45" East 172.24 feet,
South 83° 54' 21" East 75.0 feet,
North 05° 31' 47" East 187.11 feet,
North 14° 36' 35" East 305.94 feet,
North 28° 36" 04" East 187.88 feet,
South 82° 28' 45" East 75.89 feet,
South 46° 37' 15" East 177.22 feet,
South 14° 39' 20" East 158.01 feet,
South 13° 23' 55" East 208.81 feet,
South 02° 09' 55" West 210.02 feet,
South 83° 54' 20" East 120.0 feet to the point of beginning.

### Parcel 2

ALL THAT CERTAIN PLOT; PIECE OR PARCEL OF LAND, with the buildings and improvements thereon erected, situate, lying and being in the Town of Schodack, Rensselaer County, New York described as follows:

Beginning at the northwest corner of other lands of Anti-Corrosive Metal Products Co., Inc. on the U.S. Pier and Bulkhead Line on the east side of the Hudson River, thence along other lands of Anti-Corrosive Metal Products Co., Inc.:

South 46° 45' 48" East 82.81 feet to a point;
North 27° 27' 55" East 246.98 feet to a point,
North 17° 28' 45" East 172.24 feet to a point,
South 83° 54' 21" East 75.0 feet to a point,
North 05° 31' 47" East 187.11 feet to a point,

ALTA Commitment
Exhibit A

North 14° 36' 35" East 305.94 feet to a point,
North 28° 30' 04" East 187.88 feet to a point,
South 82° 28' 45" East 75.89 feet to a point,
South 46° 37' 15" East 177.22 feet to a point,
South 14° 39' 20" East 158.01 feet to a point,
South 13° 23' 55" East 208.81 feet to a point,
South 02° 09' 55" West 210.02 feet to a point,
South 83° 54' 20" East 120.0 feet to a point at the northeast corner of Parcel No. 1 of lands formerly under waters
of the Hudson River granted by the People of the State of New York to Ingalls & Co., Inc., by Letters Patent dated
November 9, 1927 and recorded in Rensselaer County Clerk's Office December 7, 1927 in Book 451 of Deeds at
page 128, said point being North 83° 54' 20" West 134.66 feet from center line monument No. 713 of the New
York Central Railroad; thence along other lands of Anti-Corrosive Metal Products Co., Inc.:

South 12° 50' 55" West 170.03 feet to a point,
South 09° 34' 40" West 230.43 feet to a point,
South 12° 50' 05" West 247.45 feet to a pin, then proceed along the west side of the Con-Rail R.O.W., 80± ft. from
the centerline of right of way with a chord of North 16° 57' 01" East 496.29 feet (curve to left radius 5650 feet) to a
point,
North 12° 30' 20" East 1117.65 feet to a pin, then proceed along the Moordener Kill
South 74° 57' 55" West 93.1 feet to a point,
South 85° 43' 00" West 280.10 feet to a point,
South 53° 55' 00" West 125.0 feet to a point,
South 65° 44' 00" West 167.3 feet to a point,
North 86° 23' 00" West 200.0 feet to a point,
North 77° 53' 00" West 210.0 feet to a pin at the east side of the Hudson River, thence along the U.S. Pier and
Bulkhead Line South 06° 19' 20" West 1063.2 feet to a pin at the point of beginning.

EXCEPTING AND RESERVING from the above described premises a parcel of land conveyed to the Village of
Castleton-on-Hudson and the Town of Schodack by deed dated February 3, 1992, and recorded in the Rensselaer
County Clerk's Office on February 4, 1992, in Liber 1640 of Deeds, at page 271.

TOGETHER WITH the rights and subject to the obligations set forth in Agreements dated April 7, 1945, between
the New York Central Railroad Company and Anti-Corrosive Metal Products Co., Inc. recorded November 6, 1968,
in Liber 1201 cp. 580 and Liber 1201 cp. 584.

**SCHEDULE B**

**Permitted Mortgages**

A.

Mortgage made by PCC Castleton Corporation and Rensselaer County Industrial Development Agency to Hamilton Industrial Corporation, dated June 14, 2016 and recorded in the Rensselaer County Clerk's Office on June 17, 2016 in Book 7848, Page 163, in the amount of $900,000.00, which mortgage was assigned by Assignment of Mortgage from Hamilton Industrial Corporation to New York Business Development Corporation dated August 10, 2016 and duly recorded with the Rensselaer County Clerk on December 16, 2016 in Volume 8038 of Records, at page 162.

Mortgage Modification Agreement between PCC Castleton Corporation and New York Business Development Corporation dated December 14, 2016 and duly recorded with the Rensselaer County Clerk on December 16, 2016 in Volume 8038 of Records, at page 166, which agreement modifies the amount of the lien to $500,000.00.

B.

Mortgage and Security Agreement (with Assignment of Leases and Rents) made by PCC Castleton Corporation to NYBDC Local Development Corporation in the amount of $412,000 dated December 14, 2016, and duly recorded with the Rensselaer County Clerk on December 16, 2016 in Volume 8038 of Records, at page 166.

Assignment of Mortgage made by NYBDC Local Development Corporation to the U.S. Small Business Administration acting by and through its certified development corporation, Empire State Certified Development Corporation, dated December 14, 2016, and duly recorded with the Rensselaer County Clerk on December 16, 2016 in Volume 8038 of Records, at page 205.

---

IN THE MATTER OF TAXATION

        OF

RENSSELAER COUNTY INDUSTRIAL
   DEVELOPMENT AGENCY

---

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) SS.: |
| COUNTY OF RENSSELAER | ) |

The undersigned, being duly sworn, deposes and says that:

1.      He resides in Rensselaer County, New York, and is the Chairman of Rensselaer County Industrial Development Agency (the "Agency") a public benefit corporation of the State of New York, established by Title 1 of Article 18-A of the General Municipal Law of the State of New York and Chapter 128 of the Laws of 1974 of the State of New York (collectively, the "Act").

2.      On or about June 14, 2016 (the "Closing Date"), the Agency acquired an interest in a portion of an approximately 27.97 acre parcel of land located at 22 Hamilton Way in the Town of Schodack, Rensselaer County, New York (tax map no. 198.-4-1.11) (the "Land"), pursuant to a certain lease dated as of June 1, 2016 (the "Underlying Lease") between the Agency and PCC Castleton Corporation (the "Company") and a certain license agreement dated as of June 1, 2016 (the "License Agreement") by and between the Company and the Agency, said Land being more particularly described in Exhibit A attached hereto.

3.      Pursuant to Section 874 of the Act and Section 1405(b)(1) of the Tax Law of the State of New York, no real estate transfer tax is due upon the instruments conveying the Land to the Agency.

4.      On the Closing Date, the Agency entered into a lease agreement dated as of June 1, 2016 (the "Lease Agreement") with the Company for the purposes of undertaking the following project (the "Project") for the benefit of the Company consisting of the following: (A) (1) the acquisition of an interest in a portion of an approximately 27.97 acre parcel of land located at 22 Hamilton Way in the Town of Schodack, Rensselaer County, New York (tax map no. 198.-4-1.11) (the "Land"), together with an approximately 100,000 square foot building located thereon (the "Facility"), (2) the renovation of the Facility, and (3) the acquisition and installation therein and thereon of certain machinery and equipment (the "Equipment"), all of the foregoing to be owned by the Company and leased to Hudson River Foods Corporation and Cell-Nique Corporation (collectively, the "Tenant") and to constitute a food processing and packaging facility (the Land, the Facility, and the Equipment being collectively referred to as the "Project Facility"); (B) the granting of certain "financial assistance" (within the meaning of Section 854(14) of the Act) with respect to the foregoing, including potential exemptions from certain sales and use taxes, real property taxes, real estate transfer taxes and mortgage recording taxes (collectively, the "Financial Assistance"); and (C) the lease of the Project Facility to the Company pursuant to the terms of the Lease Agreement.

5.    In order to finance a portion of the costs of the Project, the Company obtained a loan in the principal sum of up to $900,000 (the "Loan") from Hamilton Industrial Corporation (the "Lender"), which Loan was secured by a mortgage, security agreement and assignment of leases and rents dated as of June 14, 2016 (the "Mortgage") from the Agency and the Company to the Lender.

6.    The Company is securing additional financing with respect to the Project pursuant to a second loan (the "Second Loan") in the principal amount of $1,457,500 from New York Business Development Corporation ("NYBDC"), which Second Loan will be secured by a mortgage, security agreement and assignment of leases and rents (the "Second Mortgage") from the Agency and the Company to NYBDC.

7.    By resolution adopted by the members of the Agency on November 9, 2017 (the "Resolution Authorizing Additional Financing"), the Agency, subject to certain conditions, agreed to enter into the Second Mortgage.

8.    Pursuant to the terms of the Second Mortgage, the Agency has agreed to record the Second Mortgage in the office of the County Clerk of Rensselaer County, New York, or in such other office as may at the time be provided by law as the proper place for the recordation thereof.

9.    Pursuant to Article 18-A of the General Municipal Law, the Agency is regarded as performing a governmental function and is generally not required to pay taxes or assessments upon any property acquired by it or under its jurisdiction or control or supervision or upon its activities, and any bonds or notes issued by the Agency, together with the income therefrom, as well as the property of the Agency, together with the income therefrom, as well as the property of the Agency, pursuant to such legislation, are exempt from taxation, except for transfer and estate taxes.

10.    Deponent submits that no mortgage tax should be imposed upon the Second Mortgage because (A) said Second Mortgage is being executed and delivered under the state authority creating the Agency, (B) the use by the Agency of its powers to assist in the acquisition, construction and installation of the Project Facility is deemed by Article 18-A of the General Municipal Law to be a public purpose essential to the public interest and (C) both the New York State Department of Taxation and Finance and the Counsel have expressed their opinion that the recording of similar documents by similar agencies organized under Article 18-A of the General Municipal Law are operations of said agencies entitled to exemption from the mortgage recording tax; provided, however, since the Agency is located within a transportation district referenced in paragraph (a) of subdivision (2) of Section 253 of the Tax Law, the Agency shall not be exempt from the additional tax on the Second Mortgage imposed by said paragraph.

012207.00181 Business 16648534v1

IN WITNESS WHEREOF, the Agency has caused this affidavit to be executed in its name by its duly authorized officer described below and dated as of the 14th day of November, 2017.

RENSSELAER COUNTY INDUSTRIAL
DEVELOPMENT AGENCY

BY: _____

(~~Vice~~) Chairman

Sworn to before me this
14th day of November, 2017.

Notary Public

Pamella Weisberg
Notary Public, State of New York
Qualified in Rensselaer County
No. 01WE4943734
Commission Expires October 31, 2018

- 3 -

012207.00181 Business 16648534v1

EXHIBIT A

The Land consists of the Leased Land (as described below) and the Licensed Land (as described below).

## DESCRIPTION OF THE LEASED LAND

A leasehold interest created by a certain lease to agency dated as of June 1, 2016 (the "Lease to Agency") between PCC Castleton Corporation (the "Company"), as landlord, and Rensselaer County Industrial Development Agency (the "Agency"), as tenant, in an approximately 7.1936 acre parcel of land (the "Leased Land") located at 22 Hamilton Way (198.-4-1.11) in the Town of Schodack, Rensselaer County, New York, said Leased Land being more particularly described below), together with any improvements now or hereafter located on the Leased Land (the Leased Land and all such improvements being sometimes collectively referred to as the "Leased Premises"):

ALL THAT CERTAIN TRACT, PIECE OR PARCEL OF LAND situate, lying and being in the Town of Schodack, Rensselaer County, New York, bounded and described as follows:

IDA PARCEL:
BEGINNING at a point located on the division line between lands N/F of New York Central Lines, LLC on the East with lands N/F of Hamilton Industrial Corporation (56-137) on the West, said point of beginning being further located N-32°-00'-01"-E 146.25' from the Easterly most Northeast brick corner of the Building located on the aforesaid lands N/F of Hamilton Industrial Corporation; thence proceeding in a Southerly direction along the aforesaid division line along a curve to the right with a radius of 5650.00' for an arc length of 527.69' (Chord: S-17°-06'-35"-W 527.70') to a point, thence in a Westerly, Northerly and Easterly direction crossing the aforesaid lands N/F of Hamilton Industrial Corporation, N-64°-22'-00"-W 235.76', N-45°-30'-00"-W

370.18', N-00°-30'-00"-W 187.80', N-44°-30'-00"-E 185.22', N-74°-30'-00"-E 292.47' and S-41°-00'-00"-E 336.11' to a point, said point being the point of beginning.
BEING a parcel of land irregular in shape and containing in all 313,355±Square Feet or 7.1936±Acres.

## DESCRIPTION OF THE LICENSED LAND

A license interest created by a certain license agreement dated as of June 1, 2016 (the "License to Agency") between PCC Castleton Corporation (the "Company"), as licensor, and Rensselaer County Industrial Development Agency (the "Agency"), as licensee, in an approximately 27.97 acres parcel of land (the "Licensed Land") located at 22 Hamilton Way (198.-4-1.11) in the Town of Schodack, Rensselaer County, New York, said Licensed Land being more particularly described below), together with any improvements now or hereafter located on the Licensed Land (the Licensed Land and all such improvements being sometimes collectively referred to as the "Licensed Premises"):

ALL THAT CERTAIN TRACT, PIECE OR PARCEL OF LAND situate, lying and being in the Town of Schodack, Rensselaer County, New York, bounded and described as follows:

### - SEE ATTACHED

012207.00181 Business 16648534v1

Parcel 1

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, with the buildings and improvements thereon
erected, situate, lying and being in the Town of Schodack, Rensselaer County, New York described as follows:

Beginning at a point at the northeast corner of Parcel No. 1 of lands formerly under waters of the Hudson River
granted by The People of the State of New York to Ingalls & Co., Inc., by Letters Patent dated November 9,
1927 and recorded in Rensselaer County Clerk's Office December 7, 1927 in Book 451 of Deeds at page 128,
said point being North 83° 54' 20" West 134.66 feet from center line monument No. 713 of the New York
Central Railroad; thence along other lands of Anti-Corrosive Metal Products Co., Inc. South 12° 50' 55 West
170.03 feet to a point,
South 08° 34' 40" West 230.4 feet to a point, and
South 12° 50' 05" West 247.45 feet to an iron pin in the west line of the Con-Rail right-of-way (formerly New
York Central Railroad), said pin being 80± feet west of the center line of said railroad right-of-way, thence
along the west side of said right-of-way a chord distance of South 20° 19' 45" West 169.98 feet to a point;
thence along other lands of Anti-Corrosive Metal Products Co., Inc. being conveyed simultaneously to Village
of Castleton-on-Hudson
North 06° 16' 20" East 37.70 feet to a pin, and
North 64° 22' 00" West 796.91 feet to a pin at the east side of the Hudson River; thence along the east side of
the Hudson River along the U.S. Pier and Bulkhead Line North 06° 19' 20" East 155.68 feet to a pin; thence
along other lands of Anti-Corrosive Metal Products Co., Inc. South 46° 45' 48" East 82.81 feet,
North 27° 27' 55 " East 246.98 feet,
North 17° 28' 45" East 172.24 feet,
South 83° 54' 21" East 75.0 feet,
North 05° 31' 47" East 187.11 feet,
North 14° 36' 35" East 305.94 feet,
North 28° 36' 04" East 187.86 feet,
South 82° 28' 45" East 75.89 feet,
South 46° 37' 15" East 177.22 feet,
South 14° 39' 20" East 158.91 feet,
South 13° 23' 55" East 208.81 feet,
South 02° 09' 55" West 210.02 feet,
South 83° 54' 20" East 120.0 feet to the point of beginning.


Parcel 2

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, with the buildings and improvements thereon
erected, situate, lying and being in the Town of Schodack, Rensselaer County, New York described as follows:

Beginning at the northwest corner of other lands of Anti-Corrosive Metal Products Co., Inc. on the U.S. Pier
and Bulkhead Line on the east side of the Hudson River; thence along other lands of Anti-Corrosive Metal
Products Co., Inc.:

A-2

South 46° 45' 48" East 82.61 feet to a point;
North 27° 27' 55" East 246.98 feet to a point,
North 17° 28' 45" East 172.24 feet to a point,
South 83° 34' 2 : ' East 75.0 feet to a point,
North 05° 31' 47" East 187.11 feet to a point,
North 14° 36' 35" East 305.94 feet to a point,
North 28° 30' 04" East 187.68 feet to a point,
South 82° 28' 45" East 75.69 feet to a point,
South 46° 37' 15" East 177.22 feet to a point,
South 14° 39' 20" East 158.91 feet to a point,
South 13° 23' 55" East 206.81 feet to a point,
South 02° 09' 55" West 210.02 feet to a point,
South 83° 54' 20" East 120.0 feet to a point at the northeast corner of Parcel No. 1 of lands formerly under
waters of the Hudson River granted by the People of the State of New York to Ingalls & Co., Inc., by Letters
Patent dated November 9, 1927 and recorded in Rensselaer County Clerk's Office December 7, 1927 in Book
451 of Deeds at page 128, said point being North 83° 54' 20" West 134.66 feet from center line monument No.
713 of the New York Central Railroad; thence along other lands of Anti-Corrosive Metal Products Co., Inc.:

South 12° 50' 55" West 170.03 feet to a point,
South 09° 34' 40" West 230.43 feet to a point,
South 12° 50' 05" West 247.45 feet to a pin, then proceed along the west side of the Con-Rail R.O.W., 80± ft.
from the centerline of right of way with a chord of North 16° 57' 01" East 496.29 feet (curve to left radius 5650
feet) to a point,
North 12° 30' 20" East 1117.65 feet to a pin, then proceed along the Moordener Kill
South 74° 57' 55" West 93.1 feet to a point,
South 65° 43' 00" West 280.10 feet to a point,
South 53° 55' 00" West 125.0 feet to a point,
South 65° 44' 00" West 167.3 feet to a point,
North 86° 23' 00" West 200.0 feet to a point,
North 77° 59' 00" West 210.0 feet to a pin at the east side of the Hudson River, thence along the U.S. Pier and
Bulkhead Line South 06° 19' 20" West 1063.2 feet to a pin at the point of beginning.

EXCEPTING AND RESERVING from the above described premises a parcel of land conveyed to the Village of
Castleton-on-Hudson and the Town of Schodack by deed dated February 3, 1992, and recorded in the
Rensselaer County Clerk's Office on February 4, 1992, in Liber 1640 of Deeds, at page 271.

TOGETHER WITH the rights and subject to the obligations set forth in Agreements dated April 7, 1945,
between the New York Central Railroad Company and Anti-Corrosive Metal Products Co., Inc. recorded
November 8, 1988, in Liber 1201 cp. 580 and Liber 1201 cp. 584.

IDA PARCEL:
BEGINNING at a point located on the division line between lands N/F of New York Central Lines, LLC on the
East with lands N/F of Hamilton Industrial Corporation (58-137) on the West, said point of beginning being
further located N-32°-00'-01"-E 146.25' from the Easterly most Northeast brick corner of the Building located
on the aforesaid lands N/F of Hamilton Industrial Corporation; thence proceeding in a Southerly direction along
the aforesaid division line along a curve to the right with a radius of 5650.00' for an arc-length of 527.89'
(Chord: S-17°-06'-35"-W 527.70') to a point, thence in a Westerly, Northerly and Easterly direction crossing
the aforesaid lands N/F of Hamilton Industrial Corporation, N-64°-22'-00"-W 235.76', N-45°-30'-00"-W

A-3

370.18', N-00°-30'-00"-W 187.80', N-44°-30'-00"-E 185.22', N-74°-30'-00"-E 292.47' and S-41°-00'-00"-E 338.11' to a point, said point being the point of beginning.

BEING a parcel of land irregular in shape and containing in all 313,355±Square Feet or 7.1938±Acres.

A-4